[L. A. No. 28537. In Bank. May 24, 1966.]

KATSUKI JAMES OTSUKA et al., Plaintiffs and Appellants, v. BENJAMIN S. HITE, as Registrar of Voters, etc., Defendant and Respondent.

A. L. Wirin, Fred Okrand and Richard W. Petherbridge for Plaintiffs and Appellants.

Harold W. Kennedy, County Counsel, and Edward H. Gaylord, Assistant County Counsel, for Defendant and Respondent.

MOSK, J.—Plaintiffs appeal from a judgment which upholds a refusal of defendant, Los Angeles County Registrar of Voters, to register plaintiffs as voters. (Elec. Code, § 350.)

This case presents the difficult question whether bona fide conscientious objectors who pleaded guilty more than 20 years ago to a violation of the federal Selective Service Act can constitutionally be treated as persons convicted of an "infamous crime" and hence rendered ineligible to vote by article

II, section 1, of the California Constitution.[1] After reviewing the history and purpose of this ground of voter disqualification we have concluded that to preserve its constitutionality it must be limited to conviction of crimes involving moral corruption and dishonesty, thereby branding their perpetrator a threat to the integrity of the elective process. Plaintiffs' crime was not "infamous" as thus construed, and hence the judgment must be reversed.

The facts are not in dispute. During World War II plaintiff Otsuka, a Quaker, was classified 1A-O, i.e., a conscientious objector subject to noncombatant service in the armed forces of the United States. By reason of his religious training and belief, however, he felt he could not perform military service of any kind and should have been classified 4E, i.e., a conscientious objector subject to civilian work of national importance. He informed his draft board of his decision and refused to report for induction, surrendering himself instead at the office of the New York District Attorney. Upon his plea of guilty he was convicted of a violation of the Selective Service and Training Act of 1940 (former 50 U.S.C. App. § 311), and was sentenced by the federal district court to three years in the penitentiary. He served his term of imprisonment and was duly released.

Plaintiff Abbott's conscientious objection to military participation in any form was recognized by his draft board, and he was classified 4E. He complied with an order to report to a civilian work camp, but subsequently left the camp when it appeared to him that such activity was "an integral part of the war effort." Like Otsuka, Abbott pleaded guilty in federal court to a violation of the Selective Service Act; he was sentenced to two years in the penitentiary, served his term, and was duly released.

Now, more than 20 years later, the Los Angeles County Registrar of Voters has refused to register either plaintiff as a voter because of his wartime conviction of violating the Selective Service Act. It is conceded that in all other respects each

[1]Article II, section 1, provides in relevant part: "Every native citizen of the United States of America . . . and every naturalized citizen thereof . . . of the age of 21 years, who shall have been a resident of the State one year next preceding the day of the election, and of the county . . . 90 days, and in the election precinct 54 days, shall be entitled to vote at all elections . . . ; provided, further, no alien ineligible to citizenship, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector in this State. . . ."

plaintiff is a qualified elector under California law. Plaintiffs joined in this suit to compel registration (Elec. Code, § 350), and the matter was submitted on the pleadings together with a stipulation as to certain testimony plaintiffs would have given if called as witnesses. The trial court made findings in accord with the above statement of facts; in particular, the court found that in violating the federal statute each plaintiff "acted pursuant to his personal conscientious opposition to participation in war in any form," and that such violation was "the sole reason" for defendant's refusal to register either plaintiff as a voter. The court concluded as a matter of law, however, that under article II, section 1, of the California Constitution such convictions rendered plaintiffs ineligible to be voters, and entered judgment upholding defendant's refusal to register them.

We meet at the threshold an apparent misconception as to the source of the right to vote. ■ Defendant correctly asserts that the right to vote is not so much a "natural" as a "political" right, and that within constitutional limitations the several states are free to prescribe minimum qualifications for the exercise of that right within their borders. (Compare *Carrington* v. *Rash* (1965) 380 U.S. 89 [85 S.Ct. 775, 13 L.Ed. 2d 675], with *Lassiter* v. *Northampton County Board of Elections* (1959) 360 U.S. 45 [79 S.Ct. 985, 3 L.Ed.2d 1072].) But it does not follow, as defendant also contends, that in California the right to vote is "granted by" article II, section 1, of the state Constitution. Yet acceptance of that assertion is crucial to defendant's position: it is the premise from which he insists that plaintiffs' right to vote has not been "abridged" by article II, section 1, but was simply "not granted" by that provision in the first place.

■ Contrary to defendant's view, however, the right to vote in federal elections is conferred by the federal Constitution. (*Harper* v. *Virginia State Board of Elections* (1966) 383 U.S. 663, 665 [86 S.Ct. 1079, 1080, 16 L.Ed.2d 169, 171].) "While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states [citations], this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action" by the exercise of its constitutional powers. (*United States* v. *Classic* (1941) 313 U.S. 299, 315 [61 S.Ct. 1031, 85 L.Ed. 1368].) "It is not true, therefore, that electors for members of Congress owe their right to vote to the State law in any sense which

makes the exercise of the right to depend exclusively on the law of the State." (*Ex parte Yarbrough* (1884) 110 U.S. 651, 663-664 [4 S.Ct. 152, 28 L.Ed. 274]; accord, *Baker* v. *Carr* (1962) 369 U.S. 186, 242-243 [82 S.Ct. 691, 7 L.Ed.2d 663] [concurring opinion of Douglas, J.].) The question of the source of the right to vote in state elections appears still to be open (*Harper* v. *Virginia State Board of Elections* (1966) *supra,* 86 S.Ct. 1079, 1080-1081, 16 L.Ed.2d 169, 171); but it is settled that whatever the source, "once the franchise has been granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." (*Ibid.*) The provision of the California Constitution here challenged, as defendant construes it, purports to deny plaintiffs the right to vote in both federal and state elections.

While the right to vote is not among the specifically enumerated rights of the First Amendment, it is nevertheless one which "this [Supreme] Court has been so zealous to protect" (*Carrington* v. *Rash* (1965) *supra,* 380 U.S. 89, 96). For language of the high court typical of its ever-increasing recognition of the importance of this right, we need look no further than the decisions of the 1965 term. Thus "this Court has stressed on numerous occasions, 'The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.' *Reynolds* v. *Sims,* 377 U.S. 533, 555 [84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523]. The right is fundamental 'because preservative of all rights.' *Yick Wo* v. *Hopkins,* 118 U.S. 356, 370 [6 S.Ct. 1064, 1071, 30 L.Ed. 220, 226]." (*Harman* v. *Forssenius* (1965) 380 U.S. 528, 537 [85 S.Ct. 1177, 14 L.Ed.2d 50].) Such matters are "close to the core of our constitutional system" (*Carrington* v. *Rash* (1965) *supra,* 380 U.S. 89, 96) and "vital to the maintenance of democratic institutions" (*id.* at p. 94, quoting from *Schneider* v. *New Jersey,* 308 U.S. 147, 161 [60 S.Ct. 146, 84 L.Ed. 155]). (See also, *United States* v. *Mississippi* (1965) 380 U.S. 128, 144 [85 S.Ct. 808, 13 L.Ed.2d 717] ["the right to vote in this country is . . . precious"]; *Louisiana* v. *United States* (1965) 380 U.S. 145, 153 [85 S.Ct. 817, 13 L.Ed.2d 709] ["The cherished right of people in a country like ours to vote"]; and, finally, the recent case of *Harper* v. *Virginia State Board of Elections* (1966) *supra,* 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169, 175 ["the right to vote is . . . precious, . . . fundamental"].) ■ Rather than being a creature of the

California Constitution, the right of suffrage in this as in every other state of the Union flows from the wellsprings of our national political heritage.

In ruling on the validity of state-imposed restrictions on this fundamental right the United States Supreme Court has in effect tended to apply the principle that the state must show it has a compelling interest in abridging the right, and that in any event such restrictions must be drawn with narrow specificity. For example, race, creed, color and wealth are impermissible bases for restricting the right to vote; they are "not germane to one's ability to participate intelligently in the electoral process." (*Harper* v. *Virginia State Board of Elections* (1966) *supra,* 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169, 173.) And this court has recently adopted a similar approach in considering a county charter provision prohibiting civil servants from participating in a political campaign or election. (*Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 337 [38 Cal.Rptr. 625, 392 P.2d 385].) Viewed in this light, serious constitutional difficulties appear when the disfranchising provision of article II, section 1, is applied to these plaintiffs.

First, we must determine what compelling state interest may be served by denying plaintiffs the vote. If it be argued that a person once convicted of an "infamous crime" does not "deserve" the right to vote, then the disqualification is in effect an additional punishment for the crime; such a punishment, which here would be imposed by a state for a prior federal offense, is of doubtful constitutionality. (Cf. *Trop* v. *Dulles* (1958) 356 U.S. 86 [78 S.Ct. 590, 2 L.Ed.2d 630].) Although plaintiffs strenuously urge that punishment is the true purpose of the restriction of article II, section 1, the language of the provision indicates otherwise. Coupled as it is with an exclusion in cases of minors, idiots, insane persons, and those unable to read the Constitution and write their names, the category of persons convicted of an "infamous crime" appears rather to be an attempt to describe a non-penal qualification of *fitness* for voting.[2] But minors, mental defectives, and illiterates are deemed unfit to vote because they are lacking in the minimal understanding and judgment necessary to exercise the franchise. A different rationale must be invoked for excluding without distinction all persons who have ever been convicted of "infamous crimes," including those

---

[2]Indeed, the requirement of ability to read the Constitution and write one's name is expressly referred to in the succeeding proviso of article II, section 1, as "an educational qualification."

who possess the requisite mental and educational qualifications.

No decision of the California courts has been found discussing this point. The leading state case, quoted and paraphrased in many subsequent decisions and in the encyclopedias, is *Washington* v. *State* (1884) 75 Ala. 582 [51 Am.Rep. 479]. The court there said (at p. 585 [75 Ala.]) : "It is quite common also to deny the right of suffrage, in the various American States, to such as have been convicted of infamous crimes. The manifest purpose is to preserve the purity of the ballot box, which is the only sure foundation of republican liberty, and which needs protection against the invasion of corruption, just as much as against that of ignorance, incapacity, or tyranny. The evil infection of the one is not more fatal than that of the other. The presumption is, that one rendered infamous by conviction of felony, or other base offense indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office, upon terms of equality with freemen who are clothed by the State with the toga of political citizenship. It is proper, therefore, that this class should be denied a right, the exercise of which might sometimes hazard the welfare of communities, if not that of the State itself, at least in close political contests." In this passage lies a frank recognition of at least one tenable ground for depriving a former criminal of the vote : i.e., the fact that such person committed a crime is evidence that he was morally "corrupt" at the time he did so; if still morally corrupt when given the opportunity to vote in an election, he might defile "the purity of the ballot box" by selling or bartering his vote or otherwise engaging in election fraud; and such activity might affect the outcome of the election and thus frustrate the freely expressed will of the remainder of the voters, "at least in close political contests."

These are not fanciful fears.[3] Avoidance of such a danger, when present, is an adequately compelling state interest to justify an appropriate restriction on the right to vote.

We must next determine whether the restriction here has been drawn with sufficient specificity. ▇ In doing so, of course, we keep in mind the rule that "every reasonable presumption and interpretation is to be indulged in favor of the right of the people to exercise the elective process." (*Hedlund* v. *Davis* (1956) 47 Cal.2d 75, 81 [301 P.2d 843].) ▇ "The

[3]In recognition thereof the Legislature has enacted a detailed scheme of penal provisions designed to prevent elections offenses. (Elec. Code, div. 8, ch. 3; div. 15.)

exercise of the franchise is one of the most important functions of good citizenship, and no construction of an election law should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning." (*McMillan* v. *Siemon* (1940) 36 Cal.App.2d 721, 726 [98 P.2d 790]; accord, *Cohn* v. *Isensee* (1920) 45 Cal.App. 531, 540 [188 P. 279]; cf. *People* v. *Elkus* (1922) 59 Cal.App. 396, 404 [211 P. 34].)

▮ Plaintiffs contend that the disqualification of article II, section 1, is too broad in time, as it declares that no person convicted of the relevant crimes "shall ever" exercise the right to vote in this state. To presume, plaintiffs argue, that a man who commits a crime and is punished therefor remains forever morally corrupt is to concede him no possibility of rehabilitation, a view totally at odds with modern penological theory and legislation. This would be an appealing argument but for the fact that the Legislature has expressly provided for restoration of the right to vote to persons previously convicted of crime in California, either by court order after completion of probation (Pen. Code, § 1203.4) or, if a prison term was served, by executive pardon after completion of rehabilitation proceedings (Pen. Code, §§ 4852.01-4852.17). Plaintiffs were convicted in federal courts of a crime against the United States, and a similar though not identical method of regaining their right to vote was open to them under federal administrative procedure. (28 C.F.R., §§ 1.1-1.9 [application for pardon, investigation as to applicant's rehabilitation, and recommendation to Executive].) The use of statutory or administrative processes of this kind should be encouraged, for it provides an orderly, objective determination of the often difficult question whether a former convict has become rehabilitated to the point that he may safely be restored all the rights and privileges of citizenship.

▮ Plaintiffs apparently have not applied for such a pardon and restoration of voting rights, although they have long been eligible to do so. The point is not discussed in the briefs. It could be argued that this is in effect a failure to exhaust administrative remedies which renders the present action premature. On the other hand, this procedural deficiency should not bar plaintiffs from challenging the constitutionality of the underlying classification: i.e., if in the first place it was unconstitutional to deprive them of their right to vote on the ground here in issue, it should be immaterial that they did not thereafter apply for restoration of that right by act of executive clemency.

We turn, then, to the more serious problem of the scope of the classification adopted by article II, section 1. Defendant contends that "infamous crime" should be construed to mean *any* felony; and that, when it is so construed, the section does not discriminate because it "treats all persons convicted of felonies alike." But it is settled that "the fact that a State is dealing with a distinct class and treats the members of that class equally does not end the judicial inquiry. 'The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose. . . .' *McLaughlin* v. *Florida*, 379 U.S. 184, 191 [85 S.Ct. 283, 288, 13 L.Ed.2d 222, 228]." (*Carrington* v. *Rash* (1965) *supra*, 380 U.S. 89, 93.) The unreasonableness of a classification disfranchising all former felons, regardless of their crime, is readily demonstrable: it raises the spectre of citizens automatically deprived of their right to vote upon conviction, for example, of seduction under promise of marriage (Pen. Code, § 268), failure to provide family support (Pen. Code, § 270), wife-beating (Pen. Code, § 273d), or second-offense indecent exposure (Pen. Code, § 311); worse yet, since conspiracy to commit a misdemeanor is itself a felony (Pen. Code, § 182, subd. 1), disfranchisement would automatically follow from conviction of conspiracy to operate a motor vehicle without a muffler (Veh. Code, § 27150) or to violate any other of the myriads of lesser misdemeanor statutes on the books. No reasonable relation is apparent between this result and the purpose of protecting the integrity of the elective process. (*Harper* v. *Virginia State Board of Elections* (1966) *supra*, 86 S.Ct. 1079.)[4]

Defendant nevertheless purports to find the highest authority for the proposition that all persons convicted of felony may, without distinction, be constitutionally excluded from the franchise. Language to this general effect in *Gray* v. *Sanders* (1963) 372 U.S. 368, 380 [83 S.Ct. 806, 9 L.Ed.2d 821], *Lassiter* v. *Northampton County Board of Elections* (1959) *supra*, 360 U.S. 45, 51 and *Trop* v. *Dulles* (1958) *supra*, 356 U.S. 86, 96, was, in the context of those cases, mere illustrative dicta which we are not compelled to accept as reasoned decisions by the high court on matters of such significance.

---

[4]We have considered here the possible operation of the constitutional provision, as construed by defendant, in factual situations other than the one before us (cf. *Fort* v. *Civil Service Com.* (1964) *supra*, 61 Cal.2d 331, 339); but as will appear, our conclusion remains the same when the inquiry is narrowed to the precise offense of which these plaintiffs have been convicted.

Defendant also relies on two early "Mormon cases" (*Murphy v. Ramsey* (1885) 114 U.S. 15 [5 S.Ct. 747, 29 L.Ed. 47] and *Davis v. Beason* (1890) 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637]), which held that Congress (in *Murphy*) and the Territorial Legislature of Idaho (in *Davis*) had the power to exclude from the franchise all persons currently practicing bigamy or polygamy. These decisions are distinguishable in that each involved prospective voters who at the very time they applied to register were still brazenly flouting the laws of the jurisdiction. As the high court clearly explained in *Murphy* (at p. 43 of 114 U.S.), "The disfranchisement operates upon the existing state and condition of the person, not upon a past offense. . . . He alone is deprived of his vote who, when he offers to register, is then in the state and condition of a bigamist or a polygamist, or is then actually cohabiting with more than one woman."

 A state may constitutionally have an overriding interest in denying access to the ballot box to one who at that very time is openly violating its laws.[5] But in the case at hand plaintiffs were convicted more than 20 years ago; they paid their debt to society and, for aught that appears in the record, have since been leading exemplary lives. Moreover, the decisions in *Murphy* and *Davis* dealt with a specific course of criminal conduct, polygamy, held to be highly detrimental to the interest of society; here, by contrast, defendant's proposed construction of "infamous crime" to include any and all felonies would, as observed above, sweep into its ambit malum prohibitum conduct which is but little detrimental to society at large and is totally unrelated to the goal of preservation of the integrity of the elective process.[6]

 It has long been a cardinal rule, of course, that if a provision of the California Constitution is "capable of two constructions, one of which would cause a conflict with the federal Constitution, the other must be adopted." (*Steinhart*

---

[5]Similarly, California properly denies the right to vote, among other civil rights, to all felons currently incarcerated in state prison. (Pen. Code, § 2600.)

[6]Defendant also relies on *DeVeau v. Braisted* (1960) 363 U.S. 144 [80 S.Ct. 1146, 4 L.Ed.2d 1109], and *Hawker v. New York* (1898) 170 U.S. 189 [18 S.Ct. 573, 42 L.Ed. 1002], but these cases are not in point. They deal with the power of a state to disqualify convicted felons from holding office in waterfront labor unions (*DeVeau*) and from practicing medicine (*Hawker*). There is no doubt that the police power of the states extends, as stated in *DeVeau* (at p. 159 of 363 U.S.) to "disqualification of convicted felons for certain employments closely touching the public interest. . . ." But there is nothing in either decision to suggest that the police power can constitutionally be invoked by a state to justify restricting the fundamental right of suffrage of its citizens.

v. *Superior Court* (1902) 137 Cal. 575, 579 [70 P. 629, 92 Am.
St.Rep. 183, 59 L.R.A. 404].) In obedience to that rule
we must next determine whether the term "infamous crime"
as used in article II, section 1, may reasonably be defined in
a manner consistent with the Fourteenth Amendment. In this
connection an analysis of its origins and history in our law
will be helpful.

The term "infamous crime" first appeared in our Constitu-
tion of 1849, which similarly declared in article II, section 5,
that "No idiot or insane person, or person convicted of any
infamous crime, shall be entitled to the privileges of an elec-
tor." "Infamous crime" was not further defined in the Con-
stitution, but the first session of the Legislature soon filled the
gap. Article II of "An Act to Regulate Elections," passed on
March 23, 1850, dealt with the qualifications and disabilities of
electors. Section 12 thereof was identical with the just-quoted
provision of article II, section 5, of the Constitution of 1849;
and section 14 declared, "A crime shall be deemed infamous
which is punishable by death or by imprisonment in the state
prison." (Comp. Laws of Cal. (1850-1853), ch. 140, p. 775.)

For 22 years that definition of "infamous crime" remained
on the statute books. In 1872, however, the election laws of
1850 and intervening years were superseded by the new Politi-
cal Code. Section 1084 of that code restated the general dis-
qualification that "No idiot or insane person, or person con-
victed of any infamous crime, is entitled to the privilege of an
elector." But the statutory definition of "infamous crime"
was not reenacted in the new code, nor was any substitute
definition provided.

Seven years later the adoption of the Constitution of 1879
further complicated matters. Article II, section 1, of the new
Constitution (*ante*, fn. 1) repeated the now-familiar general
language denying the right to vote to persons "convicted of
any infamous crime," but then extended the disqualification
to the additional category of persons "hereafter convicted of
the embezzlement or misappropriation of public money."[7]
This was despite the fact that in 1879 a conviction of embezzle-
ment or misappropriation of public money was a conviction of
felony (Pen. Code, § 424), just as it is today; indeed, it has
been a felony in this state since the Constitution of 1849 com-
manded our Legislature to "pass a law providing for the

---

[7]This amendment was adopted without debate by the Constitutional
Convention. (Debates & Proceedings of Constitutional Convention (1881)
vol. II, p. 1017.)

punishment of such embezzlement, or defalcation, as a felony'' (art. IV, § 22), and the Legislature swiftly complied (Comp. Laws of Cal. (1850-1853) ch. 125, §§ 66, 67, pp. 648-649). It follows that if ''infamous crime'' is deemed to mean ''any felony,'' then article II, section 1, declares a voting disqualification applicable on its face to ''any person convicted of *any* felony *and* any person convicted of the *felony* of embezzling public money.'' It is difficult to ascribe such a redundancy to the drafters of our fundamental organic law.[8]

Still another complication is presented by article XX, section 11, of the Constitution of 1879 (based on article XI, section 18, of the Constitution of 1849), which directs that ''Laws shall be made to exclude from office, serving on juries, and from the right of suffrage, persons convicted of bribery, perjury, forgery, malfeasance in office, *or other high crimes.*'' (Italics added.)[9] What is a ''high crime''? The Legislature has not further defined the term but has responded to the command of this section, at least with regard to the right of suffrage, by simply declaring that ''Every person who qualifies under the provisions of Section 1 of Article II of the Constitution of this State'' and who is duly registered is entitled to vote. (Elec. Code, § 100.) Yet if reasonably possible, every provision of the Constitution should be given meaning and effect, and related provisions should be harmonized. (*Wheeler v. Herbert* (1907) 152 Cal. 224, 236 [92 P. 353].) It would seem that under the rule of construction *ejusdem generis*, the term ''high crimes'' should be deemed to refer to criminal conduct evidencing the kind of moral corruption and dishonesty inherent in the listed offenses of ''bribery, perjury, forgery, malfeasance in office.'' Harmonizing this definition with the more general language of article II, section 1, it would follow that ''infamous crime'' as used in the latter section should be deemed to refer to offenses evidencing such moral corruption and dishonesty.

The implications of the foregoing legislative history have

[8]Far from clarifying the matter, the Legislature has perpetuated this uncertainty by employing both forms of definition simultaneously: e.g., the statutes prescribing the contents of the affidavit of registration provide for an allegation that the affiant is not disqualified to vote ''by reason of a felony conviction'' (Elec. Code, §§ 310, subd. (h), and 321, subd. 10), while other statutes provide that the county clerk shall cancel the registration affidavit of all voters who have been ''convicted of an infamous crime or of the embezzlement or misappropriation of public money'' (Elec. Code, §§ 383, subd. (c), 389, 390).

[9]This section of the Constitution was also adopted without debate. (Debates & Proceedings of Constitutional Convention (1881) vol. III, p. 1393.)

apparently not been considered by our courts in the few reported decisions defining "infamous crime." The leading national case on the subject is *Ex parte Wilson* (1885) 114 U.S. 417 [5 S.Ct. 935, 29 L.Ed. 89]. The decision was concerned, however, with the meaning of the phrase "infamous crimes" in two different contexts, i.e., the competency of a person once convicted of an "infamous crime" to testify in any subsequent trial, and the Fifth Amendment guarantee that "No person shall be held to answer to a capital, or otherwise infamous crime unless on a presentment or indictment of a grand jury." In the former context it was the rule that "the infamy which disqualified a convict to be a witness depended upon the character of his crime, and not upon the nature of his punishment." (*Id.* at p. 422.) By contrast, in determining when the Fifth Amendment guarantee of prosecution by indictment was applicable, the Supreme Court held that the test is "whether the crime [charged] is one for which the statute authorizes the court to award an infamous punishment." (*Id.* at p. 426.)

This distinction was again drawn in the California case of *Application of Westenberg* (1914) 167 Cal. 309 [139 P. 674]. There, a newspaper publisher was prosecuted for criminal libel, a misdemeanor, on a complaint filed in police court. He was convicted, and challenged the jurisdiction of that court by application for habeas corpus. In denying the writ this court said (*id.* at pp. 319-320): "The only offenses under the old Constitution required to be prosecuted by indictment and which are embraced within 'offenses heretofore required to be prosecuted by indictment' in the present Constitution were and are 'capital or other infamous crimes.' Crimes are infamous either by reason of their punishment or by reason of their nature. In the first class fall all felonies, as the punishment therefor is imprisonment in the state prison. . . . At common law crimes which rendered the person doing them infamous were treason, felony,[10] and the *crimen falsi,* the latter embracing not only offenses, involving falsehood, but offenses injuriously affecting the administration of justice. Criminal libel does not come within any of these classes. . . .

"Our conclusion therefore is that as criminal libel is not an infamous crime the constitutional provision relied on does not

---

[10]What is a felony "at common law" depends to some extent on when the question is asked, for the common law did not remain static in this respect. A typical definition, however, would comprise murder, manslaughter, mayhem, rape, arson, robbery, burglary, and larceny.

require a prosecution for that offense to be by either indictment or information.''

There can be no quarrel with the *Westenberg* decision, provided we bear in mind that it defined ''infamous crime'' only in the context of an accused's right to be prosecuted by indictment in cases of ''capital or other infamous crimes.'' This distinction was overlooked, however, in *Truchon* v. *Toomey* (1953) 116 Cal.App.2d 736 [254 P.2d 638, 36 A.L.R.2d 1230], the first California decision to define ''infamous crime'' in the totally different context of the voting disqualification imposed by article II, section 1. As its sole authority on this question the court in *Truchon* quoted from the above language of *Westenberg*, and concluded (at p. 738) that ''under article II of the Constitution a felony is an 'infamous crime.' '' Similarly, in the only other California decision mentioning the matter (*Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 869 [338 P.2d 182]) this court cited *Westenberg* for the proposition that ''Robbery of the first degree is punishable by imprisonment in state prison and is an infamous crime.''[11]

Just as the courts have distinguished between different meanings of the term ''infamous crime'' in considering the incompetency of an ex-convict to testify and an accused's right to be prosecuted by indictment, so also a distinction should be drawn between its meanings in the latter context and as used in restricting the right to vote in article II, section 1.[12] In *Wilson* the high court emphasized that the accused's right to be prosecuted by indictment was designed for *his* protection in cases where a serious punishment was threat-

[11]In defense of the uncritical reliance on the *Westenberg* decision in *Truchon* and *Stephens*, it should be noted that each of the latter cases was principally concerned with problems of *restoring* the right to vote upon suspension of sentence or completion of probation.

[12]The distinction here suggested was drawn in similar fashion more than a half century ago in Schofield, *Cruel and Unusual Punishment* (1911) 5 Ill.L.Rev. 321, 331, fn. 20. The author pointed out, on the one hand, that ''In our law the infamy or loss of character consequent on the mode of punishment, regardless of the nature of the crime, has the legal effect, by virtue of the fifth amendment of the federal Constitution, of creating a right, i.e., the right to be prosecuted for crime against the United States by indictment of a grand jury. . . . Infamy consequent on the mode of punishment operates legally by way of anticipation as a threatened disgrace; the right to call for an indictment of a grand jury is a safeguard against that threatened disgrace.'' On the other hand, the author observed, ''Infamy or loss of character consequent on conviction of certain kinds of crime entails a loss of rights and privileges, regardless of the mode of punishment, the conviction afflicting the delinquent *instanter* with a personal legal incapacity or disability to exercise and enjoy the full measure of the political and civil rights inhering in citizenship. See the opinion of Gray, J., in *Ex parte Wilson*, 114 U.S. 417 [5 S.Ct. 935, 29 L.Ed. 89].''

ened: "When the accused is in danger of being subjected to an infamous punishment if convicted, he has the right to insist that he shall not be put upon his trial, except on the accusation of a grand jury." (*Id.* at p. 426 of 114 U.S.) Such considerations are obviously irrelevant here. As stated above, the only tenable purpose yet proposed of the voting disqualification of article II, section 1, is to protect "the purity of the ballot box" against abuses by morally corrupt and dishonest voters operating to the detriment of the electorate as a whole. But such abuses are not consistently predictable by simply considering "the nature of the punishment," in this day of indeterminate sentences and proliferation of technical, malum prohibitum offenses. Rather, the inquiry must focus more precisely on the nature of the crime itself, and determine whether the elements of the crime are such that he who has committed it may reasonably be deemed to constitute a threat to the integrity of the elective process.[13]

When the term "infamous crime" is thus construed, the voting disqualification imposed by article II, section 1, is sufficiently narrow in scope to withstand plaintiffs' challenge under the Fourteenth Amendment. ▇▇▇ We thus reach the question whether the offense of which plaintiffs were convicted is an "infamous crime" within that meaning.[14]

---

[13]We perceive no real danger that, as intimated by defendant, registrars of voters throughout the state will be flooded by applications of ex-felons and burdened by a discretion to determine whether their crimes were of a nature to disfranchise them under the views here expressed. That issue remains ultimately a judicial one, and the Legislature has provided a special procedure for resolving it. (Elec. Code, § 350.) In any event, "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." (*Carrington* v. *Rash* (1965) *supra*, 380 U.S. 89, 96.)

[14]A preliminary question may be posed as to whether in any case a conviction under the law of another jurisdiction (here, under federal law) should be given the effect of disfranchising a California citizen under California law. While in disbarment cases we have given similar effect to foreign convictions (*In re Richardson* (1940) 15 Cal.2d 536, 540 [102 P.2d 1076]), there are no California decisions of this type involving voter disqualification. In our sister jurisdictions the authorities are sharply divided: for cases giving effect to a foreign conviction, see *State* ex rel. *Barrett* v. *Sartorious* (1943) 351 Mo. 1237 [175 S.W.2d 787, 149 A.L.R. 1067], and *State* ex rel. *Olson* v. *Langer* (1934) 65 N.D. 68 [256 N.W. 377]; for cases denying such effect, see *United States* v. *Barnabo* (C.C.S.D.N.Y. 1876) 24 Fed.Cas. 1007 (No. 14,522) *State* ex rel. *Arpagaus* v. *Todd* (1947) 225 Minn. 91 [29 N.W.2d 810, 175 A.L.R. 776], and *Isaacs* v. *Board of Ballot Comrs.* (1940) 122 W.Va. 703 [12 S.E.2d 510]; cf. *In re Donegan* (1940) 282 N.Y. 285 [26 N.E.2d 260]. (See generally Notes 2 U.Chi.L.Rev. 333; 48 Harv.L.Rev. 687; 175 A.L.R. 784.)

As distinguished from the controlling constitutional or statutory language in certain of the latter jurisdictions, however, the California provision disfranchises any person "convicted of *any* infamous crime," with-

There appear to be no cases directly in point. Defendant relies on two out-of-state decisions denying a convicted conscientious objector the right to practice law (*Application of Brooks* (1960) 57 Wn.2d 66 [355 P.2d 840]; *In re Pontarelli* (1946) 393 Ill. 310 [66 N.E.2d 83]), but neither is persuasive.[15] A contrary view has been expressed by a unanimous New York Court of Appeals in *In re Koster* (1958) 3 N.Y.2d 639 [148 N.E.2d 287, 292], reversing a determination of the Superintendent of Insurance which denied the applicant an insurance broker's license on the ground that he was shown to be "untrustworthy" by reason of a conviction of violating the Selective Service Act. The applicant's claim to conscientious objector classification had been rejected by the Selective Service Board, and the appellate court reasoned: "If it is determined upon evidence that the Selective Service Board believed petitioner to be a sincere person, but one whose beliefs did not entitle him to conscientious objector status under the congressional act, then denial of his application for a license where this is the only evidence of his untrustworthiness would be arbitrary and capricious."

As noted at the outset, here each plaintiff was recognized by the authorities to be a bona fide conscientious objector, but was

---

out geographical limitation. It follows, by analogy to the disbarment cases (see, e.g., *Barnes* v. *District Court of Appeal* (1918) 178 Cal. 500, 505 [173 P. 1100]), that the place of conviction is irrelevant for the purpose of applying article II, section 1, of our Constitution; the issue is not whose laws have been violated, but whether the conviction was of an "infamous crime."

[15]In holding that the applicant's crime involved "moral turpitude," the court in *Pontarelli* relied on an Idaho case (*In re Kerl* (1920) 32 Idaho 737 [188 P. 40, 8 A.L.R. 1259]) in which an attorney was disbarred after conviction of making false statements with intent to promote the success of the enemy in wartime, wilfully attempting to cause mutiny in the armed forces, and wilfully obstructing the enlistment service; but surely such openly seditious conduct (see also *In re O'Connell* (1920) 184 Cal. 584 [194 P. 1010] is distinguishable from the quiet, intensely personal decisions taken by the present plaintiffs. In the *Brooks* case the "majority" opinion holding that the conviction established the applicant's lack of "good moral character" was signed only by its author and one other judge out of a total of nine; four judges concurred in the result, one of them writing an opinion in which he stated, "I cannot agree with the rather broad implication of the majority opinion that a conscientious objector *per se* is morally unfit to practice law in this state" (*id.* at p. 844 of 355 P.2d); and three judges dissented. In an opinion signed by two of the dissenters it is said (at p. 845) that to hold that merely being a conscientious objector proves a lack of good moral character "overlooks the fact that there may be a conflict between duty to God and duty to country. Duty to a moral power higher than the state has always been maintained," citing *inter alia* the dissenting opinion of Chief Justice Hughes in *United States* v. *Macintosh* (1931) 283 U.S. 605, 633 [51 S.Ct. 570, 75 L.Ed. 1302], concurred in by Justices Holmes, Brandeis, and Stone. (See fn. 17, *post*.)

thereafter given a draft classification which in his opinion required a greater degree of participation in the military effort than his religious and humanitarian principles would allow. Rather than sacrifice those principles each plaintiff chose to spend several years in the penitentiary, and hence pleaded guilty to a violation of the Selective Service Act. The trial court, as we have seen, found that in so doing each plaintiff ''acted pursuant to his personal conscientious opposition to participation in war in any form.'' As revealed in the stipulated testimony filed below, each plaintiff appreciated the gravity of his decision to violate the law of the state, but was impelled by obedience to a higher law and by religious and humanitarian concern for his fellow man.[16]

The United States Supreme Court has recognized principles such as these to be worthy of the highest respect and protection. In *Girouard* v. *United States* (1946) 328 U.S. 61, 68-69 [66 S.Ct. 826, 90 L.Ed. 1085], the court said: ''The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the

---

[16]Plaintiff Otsuka testified in part:

''Q. Do you feel that you as an individual have any affirmative obligation to society, that made participation in war improper or wrong for you? A. Yes.

''Q. What obligation? A. Well, in an extreme emergency such as war does bring, I feel the obligation to assist in any way possible in a civilian program under civilian direction that would help to alleviate human suffering and to promote greater human happiness, I was willing to participate in a civilian program of rehabilitation assisting in war-torn ravaged areas or in a medical research program, but that was never allowed by my draft board. . . .

''As a general rule I obey the law. I feel that it is my duty to violate the law when it involves my conscience, such as a law requiring racial segregation, or commanding me to enter the armed forces and kill human beings. When I refuse to obey the law I do not do so lightly or casually. It takes all of my faith and courage.''

Plaintiff Abbott testified in part:

''Q. . . . Mr. Abbott, do you feel that you have the duty to obey the law as a general rule? A. I do believe that I have the duty to obey the law as a general rule.

''Q. Do you feel that there are times when you have a duty to violate the law? A. There are times when I have a clear duty to violate a man-made law.

''Q. Can you tell us what times or under what circumstances you feel you have the duty to violate the law? A. After thorough, long, deliberate questioning of myself and all aspects of the action, . . .

''In the event of war, while I would not shoot or kill any human being, nor enter military service in any capacity, I would feel morally compelled voluntarily to do all that I could to assist the suffering and the hurt, no matter the risk to myself.''

ages, men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle. As we recently stated in *United States* v. *Ballard*, 322 U.S. 78, 86 [64 S.Ct. 882, 88 L.Ed. 1148], 'Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. *Board of Education* v. *Barnette*, 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].' '' And most recently in *United States* v. *Seeger* (1965) 380 U.S. 163, 169-170 [85 S.Ct. 850, 13 L.Ed.2d 733], the court said: ''Chief Justice Hughes, in his opinion in *United States* v. *Macintosh* (1931) 283 U.S. 605 [51 S.Ct. 570, 75 L.Ed. 1302], enunciated the rationale behind the long recognition of conscientious objection to participation in war accorded by Congress in our various conscription laws when he declared that 'in the forum of conscience, duty to a moral power higher than the state has always been maintained.' At 633, 51 S.Ct. at 578 (dissenting opinion).[17] In a similar vein Harlan Fiske Stone, later Chief Justice, drew from the Nation's past when he declared that 'both morals and sound policy require that the state should not violate the conscience of the individual. All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation at the hands of the state. So deep in its significance and vital, indeed, is it to the integrity of man's moral and spiritual nature that nothing short of the self-preservation of the state should warrant its violation; and it may well be questioned whether the state which preserves its life by a settled policy of violation of the conscience of the individual

---

[17]The Chief Justice continued (283 U.S. at pp. 633-634): ''The reservation of that supreme obligation, as a matter of principle, would unquestionably be made by many of our conscientious and law-abiding citizens. The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation. . . . One cannot speak of religious liberty, with proper appreciation of its essential and historic significance, without assuming the existence of a belief in supreme allegiance to the will of God. . . . There is abundant room for enforcing the requisite authority of law as it is enacted and requires obedience, and for maintaining the conception of the supremacy of law as essential to orderly government, without demanding that either citizens or applicants for citizenship shall assume by oath an obligation to regard allegiance to God as subordinate to allegiance to civil power.'' For an interesting discussion of whether every violation of legal duty is necessarily a manifestation of bad citizenship, see *United States vs. Macintosh —A Symposium* (1931) 26 Ill.L.Rev. 375; and for an excellent historical review of the question of conscientious objection, see Russell, *Development of Conscientious Objector Recognition in the United States* (1952) 20 Geo.Wash.L.Rev. 409.

will not in fact ultimately lose it by the process.' Stone, The Conscientious Objector, 21 Col.Univ.Q. 253, 269 (1919).''[18]

In view of the foregoing, it cannot reasonably be said that plaintiffs' violation of the Selective Service Act branded them as morally corrupt and dishonest men convicted of an "infamous crime" as that phrase is used in article II, section 1, of the California Constitution.

The judgment is reversed.

Peters, J., Tobriner, J., and Peek, J., concurred.

BURKE, J.—I dissent and would affirm the judgment. By what standard is the Registrar of Voters to determine whether one convicted of crime is thereby branded as a "threat to the integrity of the elective process"? Or whether the crime involved "moral corruption and dishonesty"? For example, would murder qualify? Would the circumstances under which the convicted person committed his crime be considered? If he did it while voluntarily intoxicated, would that fact have a bearing?

In the present case the majority opinon appears to emphasize that plaintiffs "were convicted more than 20 years ago; they paid their debt to society and, for aught that appears in the record, have since been leading exemplary lives." (*ante*, p. 606.) Does this mean that the time which has lapsed since conviction is to be considered? Should the registrar attempt to learn whether one convicted of crime has since been leading an exemplary life, or whether he has at least attained some degree of rehabilitation? What degree will suffice?

Presumably there are misdemeanors which will qualify for disfranchisement under the construction of "infamous crime" as laid down in the majority opinion, particularly offenses which violate provisions of the Elections Code relating directly to elections and, a fortiori, to the "integrity of the

[18]In his book, An Almanac of Liberty (1954) p. 352, Justice William O. Douglas wrote: ''It is hard to know what the influences are that shape up one's philosophy of life. Some are in the genes of the bloodstream. Some go back to happenings too distant to remember. Some come raw from experience. Perhaps Stone's tolerance for the religious scruples of an unpopular minority went back to World War I, when he served on a board of inquiry to review cases of conscientious objectors who had refused to perform military service. I knew from what he told me that it was for him a moving experience. Perhaps he learned from the quiet Quakers, or from those who are more impassioned, the full meaning of religious freedom. Perhaps he saw in the deep, burning eyes of some of the 2,000 drafted men whom he interviewed the message that there are some who will die rather than bear false witness to their religious beliefs.''

elective process." Sections 12000 through 12057 of that code designate certain of such offenses as felonies and others as misdemeanors. Section 12053 makes violation of any provision of chapter 1 of division 8 (i.e., sections 11500 et seq., dealing with expenditures for candidates) a misdemeanor. Section 29000 et seq. (division 15) specify numerous other offenses, some of which are made felonies and others misdemeanors, but all of which would seem to relate in greater or less degree to the integrity of the elective process. Many of the elections offenses would appear on their face to involve "moral corruption and dishonesty," while others might be deemed less obnoxious. By what standard is the registrar to reach a determination on these questions?

In my view, the answer to the problems presented by this case is to be found in the provisions of federal and state Constitutions, both of which plainly contemplate disfranchisement for crime. The Fourteenth Amendment of the United States Constitution, here relied upon by plaintiffs, provides in section 2 that the basis of representation among the several states shall be reduced when the right to vote at any election for the choice of electors for President or for other named officials, state and federal, is denied to adult citizens "or in any way abridged, *except for* participation in rebellion, or other *crime*, . . ." (Italics added.) Although the California Constitution in section 1 of article II declares that "no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector in this State," other provisions of the state Constitution appear to contemplate restoration of voting rights under certain circumstances. Section 4 of article II states that "For the purpose of voting, no person shall be deemed to have gained or lost a residence . . . while confined in any public prison." In section 25 of article IV appears the following: "The Legislature shall not pass local or special laws in any of the following enumerated cases, . . . Twenty-second—Restoring to citizenship persons convicted of infamous crimes." Article VII, section 1, specifies that the Governor of this state may grant pardons after conviction for all offenses except treason and impeachment, upon such conditions and with such restrictions and limitations as he may think proper, and subject to such regulation as may be provided by law relative to the manner of applying for pardons.

The quoted sections thus appear to authorize the provisions made by the Legislature for restoration of voting rights to persons convicted of crime in this state, either by court order

after probation is completed (Pen. Code, § 1203.4; see also *Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 874 [338 P.2d 182]), or by executive pardon upon completion of rehabilitation proceedings. (Pen. Code, §§ 4800 et seq., 4853, cf. § 2600; see also *Truchon* v. *Toomey* (1953) 116 Cal.App.2d 736, 744-745 [254 P.2d 638, 36 A.L.R.2d 1230]; 19 Ops.Cal.Atty.Gen. 211.)[1]

Comparable procedures are provided for seeking presidential pardon for federal offenses, with resulting removal of voting disability. (28 C.F.R., §§ 1.1-1.9; see *People* v. *Bowen* (1872) 43 Cal. 439 [13 Am.Rep. 148].)

Despite the mentioned indications of legislative intent, the majority opinion declares that to meet Fourteenth Amendment equal protection challenge, the term "infamous crime" as used in the California Constitution, article II, section 1, must be construed by determining "whether the elements of the crime are such that he who has committed it may reasonably be deemed to constitute a threat to the integrity of the elective process" and "must be limited to conviction of crimes involving moral corruption and dishonesty." Even if this approach be deemed sound, plaintiffs, who were convicted of felonies under federal law (see 18 U.S.C.A. § 1), should be required to pursue their remedy of applying for executive pardon and to make the affirmative showing of rehabilitation and of merit incident thereto, as plainly envisaged by both federal and state Constitutions and the executive pardoning power therein provided (U.S. Const., art. II, § 1; Cal. Const., art. VII, § 1) as well as by the Legislature of this state. Neither the registrars of voters nor the courts ought to be expected to attempt a determination of whether a convicted felon should be permitted to vote, until after he has first exhausted the administrative remedies made available under federal and state procedures.[2]

Traynor, C. J., and McComb, J., concurred.

---

[1]See also Elections Code sections 310, subdivision (h), and 321, item 10, in which the Legislature has required that the affidavit of registration to vote shall affirmatively show that the affiant is "not disqualified to vote by reason of a felony conviction," thus defining "infamous crime" as meaning "felony." (Cf. §§ 383, subd. (e), 389, 391, 14240, subd. (g), 14246, the latter two of which were amended in 1965 to indicate that in the view of the Legislature "infamous crime" should be taken to mean "felony.")

[2]It appears pertinent to note that Government Code section 275 states that "Unless otherwise specifically provided, every elector is eligible to

the office for which he is an elector, and no person is eligible who is not such an elector.''
'' 'Elector' means any person who qualifies under Section 1 of Article II of the Constitution of this State.'' (Elec. Code, § 20.)