CADY, Chief Justice.
In this appeal, we must decide if the Iowa Constitution disqualifies a person who has been convicted of the crime of operating while intoxicated (OWI), second offense, from holding a public office. The state elections panel (Panel) found the in-tervenor in this case was not disqualified, as did the district court on judicial review of the Panel decision. On our review of the district court decision, we hold a person convicted of the crime of OWI, second offense, is not disqualified from holding a public office in Iowa. We affirm the decision of the district court.
I. Background Facts and Proceedings.
On March 11, 2014, Anthony Bisignano filed an affidavit of candidacy for Iowa Senate in District 17 with the Iowa Secretary of State. District 17 covers a portion of Polk County, and Bisignano sought the Democratic nomination. Two days later, Ned Chiodo filed an objection to the affidavit of candidacy filed by Bisignano. Chio-do had previously filed an affidavit of candidacy for Iowa Senate in District 17. He also sought the Democratic nomination, along with another candidate, Nathan Blake. Blake is an assistant attorney general in the Iowa Department of Justice.
In the objection, Chiodo claimed Bisig-nano was disqualified from holding public office based on his prior conviction of the crime of OWI, second offense. Chiodo requested the Secretary of State not to place Bisignano’s name on the primary ballot.
Bisignano was convicted in district court of OWI, second offense, on December 9, 2013. The district court sentenced him to a term of incarceration not to exceed two years, but suspended all but seven days of the incarceration and placed him on probation with the Iowa Department of Correctional Services for two years.
The objection filed by Chiodo with the Secretary of State was heard by the three-person panel on March 19, 2014. On March 21, the Panel denied the objection.
Chiodo filed a petition for judicial review of the decision of the Panel with the district court. On April 2, the district court affirmed the decision of the Panel. Chiodo *848 promptly filed a notice of appeal. We granted expedited review.
Chiodo raises two issues for review on appeal. First, he argues Attorney General Thomas Miller was required to recuse himself from considering the objection as a part of the three-person panel due to a conflict of interest. Second, he claims a criminal conviction for an aggravated misdemeanor constitutes an infamous crime, which disqualifies a person with such a conviction from holding office under article II, section 5 of the Iowa Constitution.
We decline to consider Chiodo’s challenge to the Attorney General’s participation on the Panel. In oral argument, Chiodo acknowledged he does not assert this claim to seek a remedy in this case. We thus proceed only to consider Chiodo’s main contention that the Panel’s ruling that OWI, second offense, was not an infamous crime was contrary to the Iowa Constitution.
II. Scope of Review.
The Iowa Code authorizes judicial review of agency decisions that prejudice the “substantial rights” of the petitioner.[1] Iowa Code § 17A.19(1), (10) (2013); accord Renda v. Iowa Civil Rights Comm’n, 784 N.W.2d 8, 10 (Iowa 2010). Among the grounds upon which a district court may grant relief is action that is “Unconstitutional on its face or as applied” or action “based upon a provision of law that is unconstitutional on its face or as applied.” Iowa Code § 17A.19(10)(a,). “[W]e review agency action involving constitutional issues de novo.” Gartner v. Iowa Dep’t of Pub. Health, 830 N.W.2d 335, 344 (Iowa 2013).
III. Discussion.
The laws of this state provide that a person who seeks public office must be an “eligible elector.” Iowa Code § 39.26. An “eligible elector” under our law is a person who possesses the qualifications to be a registered voter. Id. § 39.3(6). The qualifications to vote have roots in our Iowa Constitution and address concepts of citizenship, age, and residency. See Iowa Const, art. II, § 1. In short, a person who runs for public office in Iowa must be a person who can vote in Iowa. Thus, restrictions on those who run for office are actually restrictions on those who can vote.
Voting is a fundamental right in Iowa, indeed the nation. See Devine v. Wonderlich, 268 N.W.2d 620, 623 (Iowa 1978). It occupies an irreducibly vital role in our system of government by providing citizens with a voice in our democracy and in the election of those who make the laws by which all must live. See Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964). The right to vote is found at the heart of representative government and is “preservative of other basic civil and political rights.” Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964); accord Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220, 226 (1886).
While our constitution underscores the importance and respect for the voting process that gives voice to democratic governance, it does not extend that voice to *849 every person. As with all rights, the right to vote is not absolute. Instead, two classes of people in Iowa are disqualified from voting. Under article II, section 5, “[a] person adjudged mentally incompetent to vote or a person convicted of any infamous crime shall not be entitled to the privilege of an elector.” Iowa Const, art. II, § 5.
As with many other terms and phrases in our constitution, our founders did not give us a definition of the phrase “infamous crime.” From the beginning of our constitutional journey as a state, as now, the courts have been given the role to interpret the constitution and provide the needed definition so our constitutional principles can be applied to resolve the disputes we face today. See Varnum v. Brien, 763 N.W.2d 862, 875 (Iowa 2009). Our founders not only declined to list specific crimes that would disqualify people from participating in the election process, they did not use traditional classes or categories of crimes such as felony or misdemeanor to disqualify a voter. Instead, our founders gave us the phrase “infamous crime.” The foundational question we face today is whether the crime of OWI, second offense, is an infamous crime.
We do not begin our resolution of this case on a clean slate. We have considered' the meaning of the phrase “infamous crime” in the past and have given it a rather direct and straightforward definition. We have said “[a]ny crime punishable by imprisonment in the penitentiary is an infamous crime.” State ex rel. Dean v. Haubrich, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957); accord Blodgett v. Clarke, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam); see also Flannagan v. Jepson, 177 Iowa 393, 399-400, 158 N.W. 641, 643 (1916).
If this definition is applied to resolve the question in this case, we need little additional analysis. Our legislature has defined the crime of OWI, second offense, as an aggravated misdemeanor. Iowa Code § 321 J.2(2)(6). An aggravated misdemeanor has been defined by our legislature to be a crime punishable by imprisonment within our state correctional system. See id. § 321 J.2(4)(a); id. § 901.7. Thus, under our existing interpretation of the phrase “infamous crime,” a strong argument exists that Bisignano is disqualified from running for public office, as well as participating in our democracy as a voter. He claims, however, our prior interpretation of the phrase “infamous crime” is incorrect. The Panel agreed with this claim, and we now proceed to consider it.
Our judicial process is built on the general principle of stare decisis. We normally build upon and follow our past cases. Yet, our experience has revealed times when our precedents must be overturned. State v. Miller, 841 N.W.2d 583, 586 (Iowa 2014). Within a system of justice, courts cannot blindly follow the past. Instead, we are obligated to depart from past cases when they were erroneously decided. Thus, we turn to review our prior cases that have interpreted ■ the phrase “infamous crime” to determine if those cases were correctly decided.
We first considered the phrase “infamous crime” outside the context of article II, section 5. In Flannagan, the defendant continued to maintain a “liquor nuisance” after the district court entered a decree enjoining him from doing so. 177 Iowa at 395, 158 N.W. at 641. In response, the district court held the defendant in contempt of court for failing to comply with the injunction and sentenced him to one year of hard labor in the state penitentiary. Id. at 395, 158 N.W. at 641-42.
On appeal, we were required to address the procedural rights afforded under the constitution to a person found in contempt *850 and sentenced to the penitentiary for that contempt. See id. at 898-402, 158 N.W. at 642-44. Because the Iowa Constitution limits the imposition of involuntary servitude to “punishment of crime,” Iowa Const, art. 1, § 23, the case turned on whether contempt was a crime. See Flannagan, 177 Iowa at 399, 158 N.W. at 643. To make this determination, we considered the “infamous crime” phrase found in the Fifth Amendment to the United States Constitution. See id. at 399-401, 158 N.W. at 643-44. In turn, we relied heavily on the case of Ex parte Wilson. See id. See generally Ex parte Wilson, 114 U.S. 417, 422-23, 5 S.Ct. 935, 937-38, 29 L.Ed. 89, 91 (1885).
In Ex parte Wilson, the Court noted that two concepts of infamy existed prior to the Fifth Amendment. 114 U.S. at 422, 5 S.Ct. at 937, 29 L.Ed. at 91. These two concepts addressed distinct circumstances. See id. (citing Lord William Eden Auckland, Principles of Penal Law ch. VII, § 6, at 54 (London 1771)). One concept focused on the mode of punishment for a person who commits an infamous crime; the other dealt with disqualification of a person who committed an infamous crime from being a witness. See id. “[T]he infamy which disqualified a convict to be a witness depended upon the character of his crime, and not upon the nature of his punishment.” Id. at 422, 5 S.Ct. at 937-38, 29 L.Ed. at 91. The list of infamous crimes recognized at the time included
treason, felony, forgery, and crimes injuriously affecting by falsehood and fraud the administration of justice, such as perjury, subornation of perjury, suppression of testimony by bribery, conspiring to accuse one of crime, or to procure the absence of a witness, [but not] ... private cheats, such as the obtaining of goods by false pretenses, or the uttering of counterfeit coin or forged securities.
Id. at 423, 5 S.Ct. at 938, 29 L.Ed. at 91. Because the latter definition of infamy— pertaining to disqualification — was “already established” at the time the Fifth Amendment was ratified, the Supreme Court reasoned the Fifth Amendment’s definition must incorporate the infamous-punishment standard instead. See id. at 422-24, 5 S.Ct. at 937-38, 29 L.Ed. at 91.
We followed the reasoning from Ex Parte Wilson that the right to be prosecuted by indictment for an “infamous crime” under the Fifth Amendment applied the concept of “infamous punishment,” not the particular type or character of the crime. See Flannagan, 177 Iowa at 401, 158 N.W. at 643-414. Quoting Wilson, we said, “ ‘For more than a century, imprisonment at hard labor in the ... penitentiary ... has been considered an infamous punishment in England and America.’ ” Id. at 400, 158 N.W. at 643 (quoting Ex parte Wilson, 114 U.S. at 428, 5 S.Ct. at 940, 29 L.Ed. at 93). Thus, we held in Flannagan that a person sentenced to a year of hard labor in the penitentiary was entitled to due process protections. Id. at 401-02, 158 N.W. at 644. Nevertheless, we made no effort to define an “infamous crime” under the Iowa Constitution for purposes of disqualifying .persons from voting. We also did not decide if the punishment concept or the eharacter-of-the-crime concept applied to the context of voting.
A few months after we decided Flanna-gan, we decided Blodgett. Unlike Flanna-gan, Blodgett did implicate article II, section 5 of our constitution and required us to decide if forgery (as defined in Iowa Code section 4853 (Supp.1913)) was an infamous crime. See Blodgett, 177 Iowa at 578, 159 N.W. at 244. At the time, “the punishment prescribed by statute for forgery” was “confinement in the penitentiary not more than ten years.” Id. Our una *851 bridged reasoning regarding the definition of infamous crimes was: “Any crime punishable by imprisonment in the penitentiary is an infamous crime.” Id. (citing Flannagan, 177 Iowa at 400, 158 N.W. at 643). However, we provided no other analysis in explaining our decision. See id.
Our jurisprudence on infamous crimes following Blodgett sat dormant until 1957, when we decided Haubrich. In Haubrich, the defendant had been convicted of income tax evasion under federal law, and the rights the parties assumed he had lost as a result of that conviction had been restored by the governor. 248 Iowa at 979-80, 83 N.W.2d at 452. The case turned on two questions: whether a person loses citizenship upon a federal conviction for what would constitute an infamous crime if convicted under state law' and whether the Governor of Iowa has the power to restore such a person’s rights under Iowa law, even if there has been no presidential pardon. See id. at 982-87, 83 N.W.2d at 453-56. Identifying the constitutional context of the case, however, we reiterated the concept articulated in Blod-gett and Flannagan that an infamous crime was punishable by imprisonment in the penitentiary. See id. at 980, 83 N.W.2d at 452. Thus, we did not undertake to define “infamous crime,” but only addressed the process and consequences that follow after a person is convicted of an “infamous crime.” We merely followed the path first taken forty-one years before and made no independent analysis.
This background reveals that we have never engaged in a textual analysis of the meaning of “infamous crime” in article II, section 5. Our trilogy of cases never examined the specific language of article II, section 5 and its surrounding context. We feel obligated to conduct this analysis before relying on those cases to resolve this case.
In examining the text of article II, section 5, we observe that the language used by our founders limits disenfranchisement to persons “convicted of any infamous crime.” Iowa Const, art. II, § 5. Under our constitutional interpretation framework, we first look to the words used by our framers to ascertain intent and the meaning of our constitution and to the common understanding of those words. Rants v. Vilsack, 684 N.W.2d 193, 199 (Iowa 2004). We recognize, of course, that “words at best are mere messengers of the thoughts and ideas they are sent to convey.” Rudd v. Ray, 248 N.W.2d 125, 129 (Iowa 1976). Yet, the specific constitutional language at issue speaks of a conviction of a crime, not punishment for a crime. Moreover, our founders knew the difference between the concepts of conviction and punishment. In prohibiting slavery and involuntary servitude under our constitution, our founders prohibited involuntary servitude “unless for the punishment of crime.” Iowa Const, art. I, § 23. Thus, between the two concepts of infamy discussed in Ex parte Wilson — conviction of a crime or punishment for a crime — the use of the word “convicted” in the infamous crime clause reveals our founders intended the concept of “infamous crime,” in the context of voter disqualification, to be aligned with the concept of conviction, not punishment. There is simply no textual support for using punishment to define an “infamous crime.”
It is also instructive that the obvious purpose of article II, section 5 was to declare those classes of persons who would be disqualified to vote. We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances. Redmond v. Ray, 268 N.W.2d 849, 853 (Iowa 1978). It is reasonable to conclude our founders intended to adopt *852 the concept of infamy specifically applicable to the disqualification of persons from participating in various aspects of the democratic process, not the concept of infamy applicable to punishment and procedural rights in criminal prosecutions. In the context of the limitation of political and civil rights, infamous described the nature of the crime itself, irrespective of punishment. See Snyder v. King, 958 N.E.2d 764, 773-76 (Ind.2011) (reviewing the historical backdrop of its infamous crimes clause and concluding “[h]istory thus demonstrates that whether a crime is infamous ... depends ... on the nature of the crime itself’).
It is also important to observe that the previous binary nature of punishment in Iowa has given way to a more complex and nuanced continuum of punishment. At the time of our constitutional convention, only two classifications of crimes existed — felonies and misdemeanors. Felons were sent to prison; misdemeanants were sent to jail. See Iowa Code § 2816 (1851) (“Public offenses are divided into felonies and misdemeanors.”); id. § 2817 (“A felony is an offense punishable with death, or by imprisonment in the penitentiary of this state.”); id. § 2818 (“Every other criminal offense is a misdemeanor.”). Aggravated misdemeanors did not exist in 1857 when our current constitution was drafted, see id. §§ 2816-18, nor did they exist in 1916 when we decided Blodgett and Flannagan, see Iowa Code §§ 8533-36, 8538 (1919); see also Bopp v. Clark, 165 Iowa 697, 701, 147 N.W. 172, 174 (1914). The drafters of our constitution easily could have chosen to disqualify those convicted of crimes “punishable by imprisonment in the penitentiary”; the drafters of Oregon’s constitution certainly did. See Oregon Const, art. II, § 3 (“The privilege of an elector, upon conviction of any crime which is punishable by imprisonment in the penitentiary, shall be forfeited, unless otherwise provided by law.” (Emphasis added.)). But, our drafters did not.
We conclude Blodgett was clearly erroneous and now overrule it. We also disapprove of any suggestion in Flanna-gan or Haubrich that the mere fact that a crime is punishable by confinement in a penitentiary disqualifies the offender from exercising the privilege of an elector. Consequently, Chiodo’s position quickly unravels from the threads of the three cases from which it was spun. Yet, we must still decide the underlying question whether the crime of OWI, second offense, is an infamous crime. Our constitution is supreme, Iowa Const, art. XII, § 1, and if OWI, second offense, is an infamous crime, Bisignano is disqualified from office under our constitution.
We begin our search for the meaning of the phrase “infamous crime” by observing that our legislature defined “infamous crime” in 1994 to mean “a felony as defined in section 701.7 or an offense classified as a felony under federal law.” See 1994 Iowa Acts ch. 1180, § 1 (codified at Iowa Code § 39.3(8) (1995)). While the legislature may help provide meaning to the constitution by defining undefined words and phrases, the definition provided by our legislature itself must be constitutional. See Junkins v. Branstad, 421 N.W.2d 130, 134-35 (Iowa 1988) (noting the importance of a legislative definition of “appropriation bill,” but recognizing “it does not settle the constitutional question”); cf. Powell v. McCormack, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491, 532 (1969) (“Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch.”). The legislature may not add to or subtract from the voter qualifications under the constitu *853 tion. See Coggeshall v. City of Des Moines, 138 Iowa 780, 737, 117 N.W. 309, 311 (1908). In the end, it is for the courts to interpret the constitution. See Varnum, 763 N.W.2d at 875. This important principle has, more than any other, helped allow our democracy to advance with each passing generation with our constitutional beliefs intact.
The felony-misdemeanor distinction does offer a clean bright-line rule. The benefits of such a rule are obvious, and the allure is tempting. Yet, our role is to interpret our constitution by using the language found in the constitution. We perform this role with the presumption that the drafters of our constitution were careful and thoughtful in selecting each word to convey the meaning they intended would be carried forward. If the words of the constitution do not support a bright-line rule, neither can we. Additionally, we recognize that we are dealing with a constitutional provision that disqualifies persons from voting. Ease of application does not justify a rule that disenfranchises otherwise eligible voters.[2]
A review of article II of our constitution reveals the framers clearly understood that an “infamous crime” and a “felony” had different meanings. Most immediately, article II disqualifies an elector once convicted of an infamous crime. Iowa Const, art. II, § 5. Yet, in the same article, electors “in all cases except treason, felony, or breach of the peace” are privileged from being arrested “on the days of election, during their attendance at such election, [and] going to and returning therefrom.” Id. art. II, § 2 (emphasis added). If the drafters intended the two concepts to be coextensive, different words would not have been used. This reading is bolstered by article III, section 11, which privileges members of the legislature from arrest during the session of the general assembly, or going to and returning from session “in all cases, except treason, felony, or breach of the peace.” Id. art. Ill, §11 (emphasis added). Our framers knew the meaning of felony and knew how to use the term. See In re Johnson, 257 N.W.2d 47, 50 (Iowa 1977) (“It is our duty, if fairly possible, to harmonize constitutional provisions.”). As with our reasoning dispensing with the infamous-punishment test, if our founders intended the infamous crimes clause to mean all felony crimes, we must presume they would have used the word “felony” instead of the phrase “infamous crime.” Cf. Snyder, 958 N.E.2d at 771 (“[I]f the framers had intended the Infamous Crimes Clause to apply only to felonies, we presume they would have used the term ‘felony’ instead of ‘infamous crime.’ ”). Accordingly, the legislature’s decision to define an “infamous crime” as a “felony” cannot stand alone to define the constitutional meaning of “infamous crime” because the two terms unquestionably have different meanings.
This analysis does not mean the legislative definition of “infamous crime” is not helpful in deciding the definition under *854 article II, section 5. Cf. State v. Bruegger, 773 N.W.2d 862, 873 (Iowa 2009) (“Legislative judgments are generally regarded as the most reliable objective indicators of community standards-”). In fact, given the longstanding awareness of the possible interplay between aggravated misdemeanors and our holding in Blodgett that crimes punishable by confinement in a penitentiary are “infamous crimes,” Iowa Code section 39.3(8) (2013) may represent an evolution in our shared understanding of the gravity of crimes that should subject an offender to disenfranchisement. Cf Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958) (looking to “the evolving standards of decency that mark the progress of a maturing society”); Ex parte Wilson, 114 U.S. at 427, 5 S.Ct. at 940, 29 L.Ed. at 93 (“What punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another.”). Thus, we acknowledge the legislative definition as a factor and turn to consider the meaning of the phrase “infamous crime” under article II, section 5.
The meaning of the word “infamous” in the mid-nineteenth century was “ ‘most vile; base; detestable.’ ” Snyder, 958 N.E.2d at 780 (quoting Noah Webster, A Dictionary of the English Language 202 (rev. ed.1850)). It captures a concept dating back more than 2000 years to ancient Greece, when “criminals who had committed certain heinous crimes were pronounced ‘infamous’ and thereafter ‘prohibited from appearing in court, voting, making speeches, attending assemblies, and serving in the armtf and thus prohibited from influencing public affairs.” Id. at 773 (quoting Walter Matthews Grant, et al., Special Project: The Collateral Consequences of a Criminal Conviction, 23 Vand. L.Rev. 929, 941 (1970)).
In 1839, the territorial legislature adopted a statute that declared certain persons to be “infamous.” Additionally, the statute specifically applied to voting. It stated:
Each and every person in this Territory who may hereafter be convicted of the crime of rape, kidnapping, wilful [sic] and corrupt perjury, arson, burglary, robbery, sodomy, or the crime against nature, larceny, forgery, counterfeiting, or bigamy, shall be deemed infamous, and shall forever thereafter be rendered incapable of holding any office of honor, trust, or profit, of voting at any election, of serving as a juror, and of giving testimony in this Territory.
The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182 (1839). The 1839 statute provides us with a limited window into some specific understanding of the meaning of “infamous crimefs]” of the day.
Of course, like Iowa Code section 39.3(8) (2013) today,[3] this statute is not a constitutional test. See Snyder, 958 N.E.2d at 780 (concluding an 1843 Indiana statute enumerating nine infamous crimes was not a present-day constitutional test); see also Green v. City of Cascade, 231 N.W.2d 882, *855 890 (Iowa 1975) (recognizing that while we give “respectful consideration to the legislature’s understanding of constitutional language,” we are the final arbiter of the meaning of the Iowa Constitution). Moreover, the judgment captured by the statute in 1839 preceded our constitutional convention by nearly a generation, and it was repealed before 1851.
More directly, it appears the drafters at our 1857 constitutional convention intended to deprive the legislature of the power to define infamous crimes. The proposed 1844 Iowa Constitution had contained a provision denying the privileges of an elector to “persons declared infamous by act of the legislature” Iowa Const, art. Ill, § 5 (1844) (emphasis added). This language was removed in the 1846 Iowa Constitution. See Iowa Const, art. Ill, § 5 (1846) (“No idiot, or insane person, or persons convicted of any infamous crime, shall be entitled to the privileges of an elector.”). While the 1846 constitution was modeled on the 1844 constitution, historical commentary regarding 1846 convention reveals radically egalitarian and inclusive voices influenced the debate over our incipient fundamental law: “[A] strong effort [was] made to extend this political right to resident foreigners who had declared their intention of becoming citizens.” Benjamin F. Shambaugh, History of the Constitutions of Iowa 301 (1902). This suggests its infamous crimes clause was meant to apply narrowly.
The drafters at the 1857 constitutional convention did not reinsert the 1844 language. Certainly, the drafters at our 1857 constitutional convention knew how to delegate authority over elections to the legislature. Indeed, the Indiana constitutional conventions of 1816 and 1850 gave its general assembly authority to define infamous crimes. Snyder, 958 N.E.2d at 774-75; see also Indiana Const, art. II, § 8 (“The General Assembly shall have power to deprive of the right of suffrage, and to render ineligible, any person convicted of an infamous crime.”). Our founders were aware of the 1851 Indiana Constitution, but clearly did not choose to adopt its language for article II, section 5.
As recognized by other courts, infamous crimes clauses found in many state constitutional voting provisions are properly understood as a regulatory measure, not a punitive measure. See Snyder, 958 N.E.2d at 781. Article II of the Iowa Constitution appears compatible with this approach. Our framers devoted the entire article to voting. Article II establishes the requirements to exercise the right to vote, Iowa Const, art. II, § 1; provides safeguards to the exercise of the right to vote, id. art. II, §§ 2-3; and lists two classes of individuals not granted the right to vote, id. art. II, § 5. The overall approach reveals our framers not only understood the importance for Iowans to have a voice in our democracy through voting, but they further understood the fundamental need to preserve the integrity of the process of voting by making sure it was not compromised by voices that were incompetent to meaningfully participate or voices infected by an infamous disposition. See Snyder, 958 N.E.2d at 781 (“The most common regulatory justification for criminal disenfranchisement provisions is that they preserve the integrity of elections.”).
Within this context and setting, the concept of disenfranchisement was not meant to punish certain criminal offenders or persons adjudged incompetent, but to protect “ ‘the purity of the ballot box.’ ” Id. (quoting Washington v. State, 75 Ala. 582, 585 (1884)); see also Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412, 417 (1966) (adopting the justification), abrogated on other grounds by Ramirez v. *856 Brown, 9 Cal.3d 199, 107 Cal.Rptr. 187, 507 P.2d 1345, 1353 (1973) (en banc), judgment rev’d by Richardson v. Ramirez, 418 U.S. 24, 56, 94 S.Ct. 2655, 2672, 41 L.Ed.2d 551, 572 (1974). Our drafters wanted the voting process in Iowa to be meaningful so that the voice of voters would have effective meaning. Thus, disenfranchisement of infamous criminals parallels disenfranchisement of incompetent persons under article II, section 5. The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots. As a result, the regulatory focus of disenfranchisement under article II reveals the meaning of an “infamous crime” under article II, section 5 looks not only to the classification of the crime itself, but how a voter’s conviction of that crime might compromise the integrity of our process of democratic governance through the ballot box. See Redmond, 268 N.W.2d at 853.
Any definition of the phrase “infamous crime” has vast implications and is not easy to articulate. However, we have said regulatory measures abridging the right to vote “must be carefully and meticulously scrutinized.” Devine, 268 N.W.2d at 623. Similarly, the Supreme Court has said measures limiting the franchise must be “ ‘necessary to promote a compelling governmental interest.’ ” Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284 (1972) (quoting Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969)). This context helps frame both the governmental interest at stake in protecting the integrity of the electoral process and the individual’s vital interest in participating meaningfully in their government. The definition of “infamous crime” turns on the relationship particular crimes bear to this compelling interest.
Some courts have settled on a standard that defines an “infamous crime” as an “affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections.” Snyder, 958 N.E.2d at 782; see also Otsuka, 51 Cal.Rptr. 284, 414 P.2d at 422 (“[T]he inquiry must focus more precisely on the nature of the crime itself, and determine whether the elements of the crime are such that he who has committed it may reasonably be deemed to constitute a threat to the integrity of the elective process.”). Other courts limit the definition to a “felony, a crimen falsi offense, or a like offense involving the charge of falsehood that affects the public administration of justice.” Commonwealth ex rel. Baldwin v. Richard, 561 Pa. 489, 751 A.2d 647, 653 (2000). Still other courts establish the standard at crimes marked by “great moral turpitude.” Washington, 75 Ala. at 585.
Considering the crime at the center of this case, we need not conclusively articulate a precise definition of “infamous crime” at this time. We only conclude that the crime must be classified as particularly serious, and it must be a crime that reveals that voters who commit the crime would tend to undermine the process of democratic governance through elections. We can decide this case by using the first part of this nascent definition.
Throughout our history, we have separated the seriousness of crimes by felony and misdemeanor designations. Crimes classified as felonies are serious offenses, and misdemeanors are less serious. Within this framework, “infamous crime[s],” in light of its meaning throughout history, would at most extend to the area of serious crimes occupied by felonies. The concept of infamous crime is inconsistent with the concept of misdemeanor *857 crime. It conveys a societal judgment not present in a misdemeanor, especially as it relates to the concept of disenfranchisement. Even if a misdemeanor crime could theoretically include a crime with a nexus to the voting process, see, e.g., Iowa Code § 39A.3 (describing election misconduct in the second degree and making it an aggravated misdemeanor), the nexus would be too tenuous to support disenfranchisement if considered only a misdemeanor. Thus, an infamous crime first must be a crime classified as a felony. As a misdemeanor crime, OWI, second offense, is not an “infamous crime” under article II, section 5.
It will be prudent for us to develop a more precise test that distinguishes between felony crimes and infamous crimes within the regulatory purposes of article II, section 5 when the facts of the case provide us with the ability and perspective to better understand the needed contours of the test. This case does not. OWI, second offense, is a crime that has never been considered by our legislature to be an infamous crime. It is not aligned in any way with those crimes designated by the legislature in 1839 as infamous. It is viewed by our legislature as a misdemean- or crime.[4] It is a crime that does not require specific criminal intent and lacks a nexus to preserving the integrity of the election process.
Our conclusion that OWI, second offense, is not an infamous crime does not minimize its seriousness, or the seriousness of any other misdemeanor, but recognizes our framers sought only to limit the types of crimes that should disqualify a person from voting, and that limit was drawn at “infamous crime[s].” A crime that was not serious enough to be a felony a fortiori was not intended by our founding drafters to be an “infamous crime.”
Our decision today is limited. It does not render the legislative definition of an “infamous crime” under Iowa Code section 39.3(8) unconstitutional. We only hold OWI, second offense, is not an “infamous crime” under article II, section 5, and leave it for future cases to decide which felonies might fall within the meaning of “infamous crime[s]” that disqualify Iowans from voting.
IV. Conclusion.
We consider and reject all other claims and arguments asserted by Chiodo. The crime of OWI, second offense, is not an infamous crime under article II, section 5 of the Iowa Constitution. The decision of the district court is affirmed. Anthony Bisignáno’s name may appear on the ballot.
AFFIRMED.
All justices concur except MANSFIELD and WATERMAN, JJ., who concur specially; WIGGINS, J., who dissents; and APPEL, J., who takes no part.

. In the district court, the Panel argued the proper avenue for judicial review of its action was writ of certiorari. The district court apparently disagreed, reasoning we would employ the same standards to review a claim brought under either procedural mechanism. The Panel has not appealed this aspect of the district court’s decision, and its resolution is not germane to our determination in this expedited appeal. Accordingly, we assume, without deciding, the Panel and the Attorney General are agencies subject to the provisions of chapter 17A.

. The real and substantial political equality we enjoy, and to which we all endeavor, owes in no small part to the universal suffrage among adult citizens. Denying the right to vote is a privation of our highest ideals as a society:
Denying the right to vote to people who are living and working in the community runs counter to the modern ideal of universal suffrage. Under that ideal, each citizen is entitled to cast one vote, and each vote counts the same regardless of who casts it. Voting thus becomes a powerful symbol of political equality; full citizenship and full equality mean having the right to vote.
Erika Wood, Brennan Center for Justice, Restoring the Right to Vote 4 (2009), available at http://www.BrennanCenter.org/Publication/ Restoring-Right-Vote + (last visited Apr. 15, 2014).

. We recognize article II, section 5 was amended by Iowa voters in 2008. However, there is a reason none of the parties argued the amendment gave new meaning to the infamous crimes clause. Without any question, the amendment was technical and intended only to update descriptions of mentally incompetent persons we no longer use. There was no intention to update the substantive meaning of the infamous crimes clause, and the companion judicial interpretations accordingly continued in force unaffected by the amendment. In short, the amendment did nothing but what it was intended to do: replace offensive descriptions of people with new descriptions. Thus, we properly refrain from considering the amendment in our analysis.

. Although an aggravated misdemeanor, it offers a special minimum sentence of local imprisonment of seven days, Iowa Code § 321J.2(4)(a), making it even less serious than other aggravated misdemeanors. Cf. id. § 903.1(2) (providing a maximum term of imprisonment for aggravated misdemeanors when "a specific penalty is not provided”).