## CARTER *et al. v.* CAVENAUGH.

The general character and standing of a witness, as a good or bad man, without reference to his character for truth, is not admissible for the purpose of impeaching him.

In an effort to impeach a witness, the proper inquiry is as to his general reputation for veracity, where he is best known.

### ERROR, *to Clayton District Court.*

*T. Davis,* for the plaintiff in error. The only question in this case is, whether a witness may be impeached by showing a general bad character, and not by confining the inquiry as to his character for truth and veracity.

In this case, it was proposed by the plaintiffs in error, to prove that a witness, examined by defendant in error, was of general bad character. The court refused to permit this inquiry, and restricted the inquiry as to the character of witness for truth and veracity.

This restriction, it is insisted, was erroneous. In support of this position, see Cowen and Hill's Notes, pp. 767, 768, and 769 ; Note 538, 1 Greenl. Ev. § 461, and note.

It is remarked by the author in the note, that in the northern states the inquiry is confined to character for truth and veracity, but does not cite authority. Cowen and Hill's Notes above show this a mistake, and the authorities are cited, showing a different practice in the northern states.

This question is so fully discussed in the authorities cited, that no attempt will be made to add to their fullness.

*P. Smith*, for the defendant. By the bill of exceptions, it appears that plaintiff in error made a qualified offer to show bad character of one of our witnesses; but, as it appears, it was made with a proviso that nothing could be said of the character of the witness as to truth and veracity. This proposition goes far beyond any thing to be found in the books; all authorities agree that the character for truth and veracity is proper, but the courts in N. C. and Ky. have decided that a party may go farther, and show general bad character. 1 Greenl. Ev., § 461. But in England, and the northern states of our union, the rule is confined to truth and veracity. The proposition in this case proposes to reverse the rule, and to confine the inquiry to general character, excluding character for truth; and the court ruled out the proposed testimony as improper, in the particular manner in which it was offered. There is no authority going so far as the counsel for plaintiff proposed, and the rule extending the inquiry to general character is confined to two or three states.

*Opinion by* GREENE, J. The defendants in the court below were found guilty in an action of trespass *quare clausum fregit*. On the trial, a witness gave material testimony in behalf of the plaintiff; and for the purpose of impeaching him, several witnesses were called by the defendants, who proposed interrogating them as to the general character and standing of the witness as a good or bad man, without reference to his character for truth. To this general method of impeachment, regardless of character for veracity, the plaintiff objected; and the objection was sustained by the court.

The numerous authorities upon the subject of interrogating an impeaching witness, are far from being harmonious. All agree, however, that the inquiry must be as to general reputation, extending to public opinion, either as to character for veracity or character for morality in general.

Courts of high standing have decided, that the inquiry may

be, as to the general moral character of the witness, for the purpose of impeaching him. In the case of *Hume* v. *Scott*, 3 Marsh., 260, the question, " What is the general moral character of the witness ?" was held to be correct, and that the jury might draw unfavorable inferences as to the veracity of the witness from his moral depravity. This is the strongest case we have met with in support of this more general and unrestrained method of impeaching a witness. In *The State* v. *Boswell*, 2 Dev., 209, it was decided that the witness may be proved to be of bad moral character; either with or without restricting the inquiry as to his veracity. And in the case of *The People* v. *Herrick*, 13 John., 84, it is assumed that the conviction of a crime such as petit larceny would as much destroy the credibility of a witness as if it related to his truth. In 1 Hill, N. C. Rep., 251, 253, and 1 Hall, 558, the rule of restraining the inquiry to general character for truth appears to be regarded as too contracted. That position is also sustained by the case of *The State* v. *Sterlings*, 2 Haywood, 300. Also, *Noel* v. *Dickey*, 3 Bibb., 268 ; *Blue* v. *Kirby*, 1 Monroe, 195.

Imposing as are those authorities in respectability and numbers, we by no means regard them as conclusive, nor as preponderating over those which favor the limitation to inquiries of general character for truth. The method of questioning as to general character alone, appears to us, not only vague, but subject to great abuse and injustice. Clanish witnesses, whose intercourse and business are limited to a particular class of kindred spirits, who may constitute a majority of the neighborhood, often entertain peculiar and contracted views of general character, when applied to those who may not agree with them in social, religious, or political tenets. And thus, by a decided majority of one neighborhood, a man might be represented as possessing an excellent general character; while in an adjoining neighborhood, where equally well known, he might be described as a man of great moral turpitude.—Observing men in our own and in the adjoining states, must have seen this neighborhood prejudice against individuals frequently illustrated, and carried to very unjust and pernicious extremes.

Take a community of Mormons, and an adjoining one of anti-Mormons. A person known and observed alike by both communities, would likely be regarded by the one whose views he favored and advocated, as a man of moral worth; but by the other, as depraved and bad. Indeed, wherever religious enthusiasm rages and encounters opposition, we see these conflicting views of general good or bad character signally exemplified. But confine the inquiry to its legitimate object—to a specific and definite point, and then, even under such influences, the truth may be attained. Even where fanaticism or political animosity abounds, a man may be regarded and represented as a bad character, and still recognized as worthy of credit under the solemnities and responsibilities of an oath. The requisites of a good character, and the components of a bad one, are so variously viewed by different, and even adjacent communities, that they never can become a safe and uniform test of veracity, without confining the inquiry particularly to character for truth. In some communities an ultra-mason, in others a proscriptive anti-mason; in this neighborhood an abolitionist, in the adjoining one an anti-abolitionist, would be regarded and styled a bad character; and thus, in many communities, he who plays cards, or engages in horse-racing, or frequents groceries, or works on the sabbath-day, is looked upon and called a bad character; and yet such men—either the advocates of unpopular sentiments, or those addicted to objectionable habits—may have a most commendable regard for veracity. Man is so constituted, that in the observance of some virtues he may be weak and unreliable, while in others he may be strong and exemplary. There is, perhaps, no maxim better established on truth than that, " all men have their failings." All fall into some vice of omission or commission; while many commit offences of a grave and reprehensible character. A man of strict truthfulness and of unblemished integrity in all business relations, may perpetrate many things which would give him the general reputation of a bad man; another may have a bad character as a business man, and still retain a most tenacious reverence for truth; and a

Carter *v.* Cavenaugh.

third might have a propensity for lying, and even perjury, regarding them as trivial vices, while he would eschew offenses of much less turpitude.

Though true it is, that to be honorable, a man must be strictly honest; still, he may be honest without being honorable. Honesty is limited to pecuniary dealings, but honor extends to the sentiments of the heart and to general deportment. The honest man will pay all, and defraud no one; but still, in many instances, he may act and feel dishonorably. So, too, a man may possess the utmost veracity and truthfulness, and still have the general character of a bad man in community, for vices perfectly compatible with a proper regard for the solemnity and obligation of an oath. And thus, by opening this boundless field of inquiry as to "bad character" in its multitudinous phases, the most truth-abiding men might often be impeached.

The term "bad character," applied to man or woman, is used, by very common acceptation, to designate loose, immoral, or lascivious deportment; but who, properly regarding the weight of authorities, will contend that proof of such deportment is admissible to impeach a witness? It is true, that in the case of *The Commonwealth* v. *Murphy*, 14 Mass., 387, it was held, that a witness might be impeached by showing her to be a common prostitute; but this principle was distinctly overruled in the following cases: *The Commonwealth* v. *Moore*, 3 Pick., 194; *Jackson* v. *Lewis*, 13 Johns. 504; *Gilchrist* v. *M'Kee*, 4 Watts, 380; *Wilds* v. *Blanchard*, 7 Verm. 141; *Bakeman* v. *Rose*, 14 Wend. 105; *Spears* v. *Forrest*, 15 Verm. 435.

As a general rule, it is clear that the question of chasteness cannot become a proper inquiry to discredit a witness; but to this rule there are exceptions: for on an indictment for a rape, or in a proceeding for seduction, and the like, it is admissible, at least to impair the weight of testimony. *U. S.* v. *Vansickle*, 2 M'Leans, 223.

Indeed, the proof of particular offenses, or facts, of any nature, is not admissible for the purpose of impeachment. How then can it be considered competent to prove the bad charac-

ter resulting only, in many instances, from some such offense or fact? That evidence of having committed a crime or offense is incompetent, is shown by some of the authorities already cited. See also *Barton* v. *Morphis*, 2 Dev., N. C., 520; *Walker* v. *The State*, 6 Blackf., 1; *Rixey* v. *Bayse*, 4 Leigh's Va., 330; *U. S.* v. *Brockens*, 3 Washington, C. C., 99; *Clarke* v. *Hill*, 2 Har. and M'Hen., Md., 378; *Cole* v. *Cole*, Har. and J., Md., 572.

But when a witness has been legally and finally adjudged guilty of an infamous crime, he is rendered incompetent, unless rehabilitated by pardon. Such infamy results only from the heinous crimes classed as treason, felony, and the *crimen falsi* as understood at common law. Formerly the punishment was considered the cause of infamy, but now it appears settled that the infamy arises from the enormity of the crime; and still the fact that a mere pardon in most cases restores competency is not altogether consistent with the idea that it is the crime alone which induces the exclusion; for the corruption— the moral depravity, indicated by the crime, is not removed by the pardon; but the condemnation is, and with it is removed the infamy as a witness. But this question of infamy, though adverted to in the arguments by counsel, has but little bearing upon the leading point involved in this case. And upon this point—upon the inquiry as to the proper method of interrogating an impeaching witness, sufficient has already been stated. The decision of the district judge in prohibiting a method of inquiry so loose and unrestrained, is, we think, clearly consonant with the soundest and safest principles of evidence. In proceeding to impeach a witness, the very object of the examination sufficiently indicates and determines the proper inquiry. The object is not to expose the bad character of the witness generally and indiscriminately to public scrutiny, but rather to develop his character for veracity—to determine his credibility. His character for truth is the character sought, and not his character as a bad man, or a good man, in anything or everything else; in the comprehensive and various applications of "good" and "bad," as applied to character. The

Carter *v.* Cavenaugh.

real object of the inquiry can only be effectually attained by showing whether the witness is generally considered worthy of credit in the neighborhood in which he lives, and among those by whom his character for truth is best known.

Starkie declares the proper method of impeaching a witness is by general evidence, that he is not worthy to be believed upon his oath; and that the proper question is, " Whether he would believe him upon his oath?" Starkie on Ev., part 2, 146. A witness called to impeach another is not to speak of his private opinion, or of particular facts in his own knowledge; but he must speak of the common reputation among his neighbors and acquaintances, and of his general character in point of truth. Swift's Ev., 143.

In 2 Russell on Crimes, 635, the rule laid down is, to ask the witness whether he has had means of knowing the general character of the witness sought- to be impeached; and whether, from such knowledge, he would believe him on his oath? This is the prevailing rule in England, and is recognized in New-York. *Johnson* v. *The People*, 3 Hill, 179; Cowen and Hill's Notes to Phil. on Ev., *n.* 531, p. 767 to 771.

Phillips states that the regular mode of examining into general character is to inquire of the witnesses, whether they have the means of knowing the former witness's general character, and whether, from such knowledge, they would believe him on his oath. 1 Phillips on Ev., 292. Indeed, the English authorities uniformly favor and recognize this manner of interrogation, and though much more specific, and in conformity to the object of the inquiry, than the method urged by plaintiff's counsel in the present case, we still regard it as very objectionable. There is manifest- impropriety, we think, in permitting the witness to testify as to his own opinion, in believing the person under oath. It is a deviation from that salutary rule of evidence which precludes the opinions of witnesses, except as experts in some questions of skill and art, or in the value of property, and as witnesses to a will. The testimony should be confined to facts relative to. the general reputation of the witness for truth, and from those facts the jury

12

are to form an opinion. It was justly remarked, in the case of *Phillips* v. *Kingfield*, 1 Appleton's R., 375, that "to permit the opinion of a witness that another witness should not be believed, to be received, and acted upon by a jury, is to allow the prejudices, passions, and feelings of that witness to form, in part, at least, the elements of their judgment. To authorize the question to be put, whether the witness would believe another witness on oath, although sustained by no inconsiderable weight of authority, is to depart from sound principles and established rules of law, respecting the kind of testimony to be admitted for the consideration of a jury, and their duties in deciding upon it." These views are rational, and must commend themselves to the experience and judgment of every lawyer. Mere opinions are never very reliable, and when emanating from the haste and excitement of a witness' stand, are seldom well-matured or deliberately given; and expressed as to the character of others, they are too often influenced by personal disagreement or party malice, to be regarded as a safe inquiry, or a reliable test of veracity. We rejoice, therefore, that the propriety of the practice has of late been questioned by many of our soundest jurists and able American courts; and that, in the language of Greenleaf, "perhaps the weight of authority is now against permitting the witness to testify as to his own opinion." 1 Greenl. Ev., § 461.

Judge Story says, in the case of *Gass* v. *Stinson*, 2 Sumn. 610, "When the examination is to general credit, the course in England is, to ask the question of the witnesses, whether they would believe the party sought to be discredited upon his oath? With us, the more usual course is to discredit the party by an inquiry, what his general reputation for truth is, whether it is good, or whether it is bad?"

Swift's Evidence, 143, adds much weight to our position. The author confidently declares, that a witness called to impeach another is not to speak of his private opinion or of particular facts in his own knowledge; but he must speak of the common reputation among his neighbors and acquaintances; and that the only proper questions to be put, are: "Whether

he knows the general reputation of the witness intended to be impeached, in point of truth, among his neighbors? and what that reputation in point of truth is—whether good or bad?" This we believe to be the legitimate and true course of investigation. It limits the inquiry to the specific object sought. It particularly directs the attention of the witness to the subject and facts about which he is called upon to testify; and brings the question of credibility, and the testimony, in a reliable form before the jury. Having before them his general reputation for truth, together with his manner of testifying, and other connecting circumstances, they are enabled to arrive at a correct conclusion upon the question of the witness's veracity.

This view of the rule is also supported by Judge McLean, in the case of *United States v. Vansickle,* 2 McLean's, 219. In concluding his able and elaborate opinion in that case, the judge remarks that, " As the rule now stands, we think a witness can only be impeached, under this head, by proof of general character as it regards his veracity."

Having carefully examined all the authorities within our reach, we have, in deciding this case, endeavored to follow those of prevailing right and reason. We have endeavored to recognize and adopt those rules which will best subserve the ends of justice; which are best adapted to the character of our people, and the jurisprudence of our state.

Judgment affirmed.