WIGGINS, Justice
(dissenting).
In Chiodo v. Section Panel, I was compelled to dissent from the plurality decision. 846 N.W.2d 845, 863-65 (Iowa 2014) (Wiggins, J., dissenting). In doing so, I made two points. The first was that it is this court’s duty and- obligation, not the legislature’s, to interpret the meaning of the phrase “infamous crime” in article II, section 5 of the Iowa' Constitution. Id. at 864. It appears from the opinions filed today, the court agrees with this principle. Today, I reaffirm my position on this point of law.
I also agree with the court’s view that the Iowa Constitution is a living document. *206 As we have said numerous times in our jurisprudence:
, [W]e recognize that unlike statutes, our constitution sets out broad general principles. A constitution is a living and vital instrument. Its very purpose is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption. Thus the fact a separate juvenile court system was not in existence at the time our constitution was adopted in 1.857 should not blindly mandate an absurd result because our forefathers had not yet seen fit to establish a separate juvenile court system. Sometimes, as here, the literal language must be disregarded because it does violence to the general meaning and intent of the enactment.
In re Johnson, 257 N.W.2d 47, 50 (Iowa 1977) (citations omitted); see also State v. Barker, 116. Iowa 96, 105, 89 N.W. 204, 207 (1902) (reciting these same, principles over 100 years ago).
In my Chiodo dissent, I also expressed unwillingness to deviate from our prior caselaw defining “infamous crimes” due to the uncertainty.it would cause for voters and election officials in this state. 846 N.W.2d at 864-435. Today I am prepared to change my position on this point. I do so for two . reasons. First, Justices Appel and Hecht have set forth compelling.reasoning and analysis in their opinions concerning how voters and election officials can determine who is an eligible voter. Additionally, the majority’s analysis is flawed in that it does not truly consider the consensus among other states, most of which allow at least certain felons to vote. By focusing solely on our cruel-and-unusual-punishment jurisprudence to arrive at its conclusion, the majority’s incomplete analysis gives short shrift to a matter concerning individual rights. Its approach represents a stark retreat from the robust analysis of individual rights under the Iowa Constitution this court traditionally applies. See generally Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009) (applying our traditional approach to matters involving individual rights under the Iowa Constitution).
More importantly, the brief of the Polk County Auditor has caused me to reevaluate my thoughts on this issue. The Polk County Auditor administers the election in the largest and most diverse county in the state. In his brief, he states that under a protocol similar to that urged by Justices Appel and Hecht, he would be able to implement and administer a policy that would ensure all persons with prior felony convictions who were eligible to vote could do so.
For this reason, I cannot join the majority opinion. Therefore, I dissent and join Justices Appel and Hecht in their dissents.
.HECHT and APPEL, JJ., join this dissent.
HECHT, Justice
(dissenting).
I do not share the majority’s conclusion that Griffin was convicted of an “infamous crime” supporting her disenfranchisement under article II, section 5 of the Iowa Constitution or Iowa Code section 39.3(8) (2013).[18] I believe an infamous crime that disqualifies a citizen from voting must at least feature some nexus to the electoral *207 process. Accordingly, I respectfully dissent.
The majority concludes Griffin’s 2008 conviction of delivery of 100 grams or less of cocaine in violation of Iowa Code section 124.401(l)(c )(2)(b) (2007), a Class “C” felony, is an infamous crime.[19] The majority also notes all fifty states criminalize delivery of cocaine and the offense is a serious one causing continuing harm to society.
As the majority correctly observes, the drafters of our constitution did not define “infamous” in this context. The many meanings courts and legal scholars assigned to the word over the centuries are well documented in the majority’s opinion. Although the legislature expressed its understanding in 1994 that all felony crimes are infamous for purposes of identifying eligible voters, see 1994 Iowa Acts ch. 1169, § 7, the task of interpreting the Iowa Constitution falls to this court — not the legislature. See Varnum v. Brien, 763 N.W.2d 862, 875 (Iowa 2009); see also Chiodo v. Section 43.24 Panel, 846 N.W.2d 845, 853 (Iowa 2014) (“In the end, it is for the courts to interpret the constitution.”); Peel v. Burk, 197 N.W.2d 617, 622 (Iowa 1972) (Reynoldson, J., dissenting) (“This court, not the legislature, is empowered to interpret the constitution.”). “The legislature may not add to or subtract from the voter qualifications under the constitution.” Chiodo, 846 N.W.2d at 852; Coggeshall v. City of Des Moines, 138 Iowa 730, 737, 117 N.W. 309, 311 (1908).
In the plurality opinion in Chiodo, Chief Justice Cady explained “the concept of disenfranchisement was not meant to punish certain criminal offenders or persons adjudged incompetent, but to protect the ‘purity of the ballot box.’” Chiodo, 846 N.W.2d at 855 (quoting Snyder v. King, 958 N.E.2d 764, 781 (Ind.2011)). Further explicating the drafters’ objective in article II, section 5, he wrote,
Our drafters wanted the voting process in Iowa to be meaningful so that the voice of voters would have effective meaning. Thus, disenfranchisement of infamous criminals parallels disenfranchisement of incompetent persons under article II, section 5. The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots. As a result, the regulatory focus of disenfranchisement under article II reveals the meaning of an “infamous crime” ... looks not only to the classification of the crime itself, but how a voter’s conviction of that crime might compromise the integrity of our process of democratic governance through the ballot box.
Id. at 856. I joined the plurality opinion in Chiodo, see id. at 857, and I continue to believe the animating purpose of the disenfranchisement clause is the protection of the voting process and the integrity of the institutions of democratic governance. With this fundamental understanding of the purpose of the clause, I now turn to the analytical framework for deciding whether the district court erred in interpreting Iowa Code section 39.3(8) (2013) and article II, section 5 of the Iowa Constitution.
The right Griffin asserts — the right to vote — is a fundamental right. Devine v. Wonderlich, 268 N.W.2d 620, 623 (Iowa *208 1978); .accord Chiodo, 846 N.W.2d at 848 (“Voting is a fundamental right in Iowa, indeed the nation.”)- Voting occupies a “vital role in our system of government by providing citizens .with a voice in our democracy and in the election of those who make the laws by which all must live.” Chiodo, 846 N.W.2d at 848. Although this right is essential to fulsome participation in self-government, it is not absolute. Id. at 849. Because the right is fundamental, we must apply strict scrutiny in deciding Griffin’s claim. A law that impedes a fundamental right is unconstitutional if it is not narrowly tailored to serve a compelling government interest, Santi v. Santi, 633 N.W.2d 312, 317 (Iowa 2001). In my view, disenfranchising voters for class “C” felony drag offenses will not advance the integrity of elections or institutions of government. Indeed, I am not convinced that Griffin’s conviction for delivery of cocaine or her subsequent exercise of the right to vote will tend to threaten or subvert the voting process; nor will it diminish in any untoward manner the voices of other voters.
I further conclude section 39.3(8) and the related statutes disenfranchising all felons fail to pass strict scrutiny analysis because the classification of all felonies as infamous crimes is not narrowly tailored to serve any legitimate purpose of the disqualification clause. The statute’s definition of infamous instead sweeps broadly past those crimes which might be plausibly understood to diminish the integrity of the voting process or the integrity of democratic institutions of governance, and it disenfranchises persons — like Griffin— whose criminal conduct is completely unrelated to any legitimate nonpunitive and protective purpose of the disqualification clause.'
Our strict scrutiny of the statutory framework disenfranchising Griffin and others similarly situated cannot be driven by majoritarian preferences about the propriety of disqualifying .all felons as electors. Given the fundamental nature of the right to vote, we should not deny it to Griffin just because most folks favor disenfranchisement of all felons; neither should we deny her the right because “that is the way it’s always been in Iowa” or because “that’s the way it’s done elsewhere.” Our scrutiny must instead confront the hard question of whether there is a compelling governmental interest in disenfranchising her for drug-related offenses. In my view, there is not.
The notion that allowing Griffin to vote will render the ballot, box impure, disrupt the electoral process, or damage institutions of democratic governance is fanciful at best. I posit there is no legitimate basis for concluding Griffin’s vote will have any such adverse effects; and precluding her vote will, in my view, advance no compelling government interest. Her disenfranchisement instead seems to rest on .the notion that allowing convicted felons, who have discharged their sentences to vote “will taint the body politic.” Mary Sigler, Defensible Disenfranchisement, 99 Iowa L. Rev. 1725, 1730 (2014) [hereinafter Si-gler], But that notion is misguided because it -relies on the “mystical claim” that all felons are tainted and. therefore will somehow infect the entire electoral process, see George P. Fletcher, Disenfranchisement as Punishment: Reflection on the Racial. Uses of Infamia, 46 UCLA L. Rev. 1895,1899 (1999), and because it is “a call for retribution with no tangible benefit,” Mark Haase, Civil Death in Modem Times: Reconsidering Felony Disenfranchisement in Minnesota, 99 Minn. L. Rev. 1913,1933 (2015) [hereinafter Haase].
In reaching my conclusion that section 39.3(8) and the related statutes relied upon by the respondents in denying Griffin ac *209 cess to; the polls fail to serve a compelling government interest, I am aided by “constitutional facts,” including public policy arguments. See Vamum, 763 N.W.2d at 881, 898-906 (analyzing “all of the material tendered by the parties,” including public policy arguments, to assist in the review of the constitutionality of a statute); Sahti, 633 N.W.2d at 318-19 (considering whether a law “strengthen[ed] extended familial bonds” or caused “family disruption” in deciding á constitutional challenge to a statute). I have also considered the societal impact of denying the franchise to those convicted of noninfamous crimes. See Vamum, 763 N.W.2d at 881 (noting “judicial decision-making in the context of constitutional issues” may require courts to analyze facts beyond those relating to the parties and their particular circumstances, including “social,, economic, political, or scientific facts”).
Following the issuance of Executive Order 70, more than 14,000 Iowans were disenfranchised in almost four years. See Editorial, No Vote for Iowa’s Felons, Cedar Rapids Gazette (Dec. 7, 2014), www. thegazette.com/subject/opinion/staff-editor ial/no-vote-for-iowas-felons-20141207 (reporting that from January 2011 to December 2014, “roughly 14,500” Iowans completed their sentences after committing a felony, but fewer than 100 regained their voting rights). Because many of these disenfranchised felons — like Griffin — were convicted of crimes having no relationship to the integrity of the electoral process or other democratic institutions, I believe a negative societal impact has occurred. Voting encourages persons to become informed about and involved in their communities’ civic affairs — behaviors that maximize the chances of rehabilitation for those convicted of crimes. Disqualification, on the other hand, stigmatizes felons and undermines their reintegration to society by treating them as second-class citizens even after they have served their prison sentences.. See, e.g,, Atiba R.. Ellis, Tiered Personhood and the..Excluded Voter, 90 Chi.-Kent L. Rev. 463, 477 (2015) (“[D]is-enfranchisement .creates a permanent underclass of citizenry whose interests are not heard .,. with no hope of ever effectively reengaging with society.”); Sigler, 99 Iowa L. Rev. at 1739 (“[Pjermanent exclusion of offenders, certainly those already released from prison, is tantamount to political exile and 'inconsistent with the rights and responsibilities of citizenship .... ”); Howard Itzkowitz & Lauren Oldak, Note, Restoring the Ex-Offender’s Right to Vote: Background and Developments, 11 Am. Crim, L. Rev, 721, 732 (1973) (“The offender finds himself released from prison, ready to start life anew and yet at election time still subject to the humiliating'implications of disenfranchisement. ... Denying him the right to vote forbids his participation in the most crucial function of a democratic society — the electoral process — and is likely to reaffirm feelings of alienation and isolation, both so detrimental to the reformation process.”). Some evidence even suggests disenfranchisement is associated- with increased ■crime rates. See Christopher Uggen & 'Jeff Manza, Voting and Subsequent Crime and Arrest: Evidence from a Community Sample, 36 Colum. Hum. Rts. L. Rev. 193, 213 (2004) (collecting data and concluding “a relationship between voting and subsequent crime and arrest is ... supported by empirical evidence”); see also Hadar Ávi-ram '& Jessica L. Willis, Reintegrating Citizens: Felon Enfranchisement, Realignment, and the California Constitution, 27 J. C.R. & Econ.. Dev. 619, 652-53 (2015) (discussing two studies); Haase, 99 Minn. L. Rev. at 1927 (“The evidence shows that disenfranchisement does not deter crime or lower recidivism. Public safety is thus *210 not advanced and may actually be undermined by felony disenfranchisement.”).
Disenfranchisement of noninfamous felons also tends to depress the votes of others. The propensity of young people to vote is correlated with their parents’ behavior and resources. Eric Plutzer, Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood, 96 Am. Pol. Sci. Rev. 41, 42-43 (2002). Accordingly, a parent’s disenfranchisement tends to discourage voting by other family members. See Christopher Haner, Felon Disenfranchisement: An Inherent Injustice, 26 J. C.R. & Econ. Dev. 911, 917 (2013) [hereinafter Haner] (“Individuals who are not disenfranchised ..., especially those with parents who have suffered disenfranchisement, may not feel that voting is important or may feel that it is a useless exercise of political power because they do not see the fruits of exercising this right.”); see also Erika Wood, Restoring the Right to Vote 12 (2009), www. brennancenter.org/sites/default/files/legacy /Democracy/Restoring% 20the% 20Right% •20to% 20Vote.pdf.
When disproportionate numbers of citizens in the same community are denied the right to vote, the political power of the community’s residents — including those who have never been convicted of a crime — is weakened. See Aman McLeod et ah, The Locked Ballot Box: The Impact of State Criminal Disenfranchisement Laws on African American Voting Behavior and Implications for Reform, 11 Va. J. Soc. Pol’y & L. 66, 77-78 (2003) (collecting voter turnout data, comparing it among states, and concluding “mean voter turnout ... is statistically lower in states with moderately to extremely restrictive disenfranchisement laws”); Reuven Ziegler, Legal Outlier, Again? U.S. Felon Suffrage: Comparative and International Human Rights Perspectives, 29 B.U. Int’l L.J. 197, 208 (2011) (“[Ejxpelling the convict from the community fails to recognize that she remains a community member.”); see also Haner, 26 J. C.R. & Econ. Dev. at 917 (“If a neighborhood has a large number of citizens living in it who are disenfranchised, the community loses power-”).
I am persuaded that disenfranchising persons convicted of noninfamous offenses has other deleterious social consequences. It is a component of the “otherness” observed by one commentator, promoting a separation between community members and law enforcement officers. See William Stuntz, The Collapse of American Criminal Justice 310-12 (2011). As a result, the effectiveness of community policing may be undermined, especially in communities with high rates of disenfranchisement. Cf. id.
I emphasize here my purpose is not to diminish the gravity of Griffin’s felony conviction, for which she has been sentenced and punished. I merely conclude continuing to disenfranchise her for that conviction serves no compelling government interest. Because I believe Griffin’s disenfranchisement undermines the government’s compelling interest in her rehabilitation and reintegration to society after her sentence was discharged, I would reverse the district court and remand for entry of a judgment declaring Griffin’s 2008 criminal conviction does not render her presumptively ineligible to vote.
WIGGINS and APPEL, JJ., join this dissent.
APPEL, Justice
(dissenting).
The majority does its best to interpret an anachronistic constitutional provision in the modern context. It is not an easy task. For the reasons expressed below, I come to a different conclusion than the majority. I believe the term “infamous crime” in article II, section 5 of the Iowa *211 Constitution does not sweep so far as' to disqualify Griffin from voting. As a result, I respectfully dissent.
In this case, Griffin has fully satisfied the demands of the criminal law as enacted by the Iowa legislature and she has been discharged from the criminal justice system.' In colloquial terms, she has paid her debt to society and returned to riormal life. The question here is whether the Iowa Constitution permits the legislature to prohibit all felons — regardless of the nature of the underlying crime — from exercising the fundamental right to vote after the criminal sanctions imposed as a result of conviction have been fully satisfied.
The question is determined by our interpretation of article II of the Iowa Constitution dealing with the right of suffrage. Article II, section 1 generally provides that every citizen who is a resident of the state “shall be entitled to vote at all elections.” Iowa Const, art. II, § 1. More than a hundred years ago, we stated that the right to vote is “a political right of the highest dignity.” Coggeshall v. City of Des Moines, 138 Iowa 730, 737, 117 N.W. 309, 312 (1908). More recently, the United States Supreme Court has said, “It is beyond cavil that ‘voting is of the most fundamental significance under our constitutional structure.’ ” Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245, 252 (1992) (quoting Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230,241 (1979)).
Yet article II, section 5 of the Iowa Constitution disqualifies from voting persons “adjudged mentally incompetent to vote” or “convicted of any infamous crime.” Our task is' to determine the boundary between the powerful, general command of article II, section 1 — vesting the right to vote in every citizen — with the exception provided in article II, section 5 — disqualifying persons convicted of infamous crimes from voting. See Hutchins v. Hanna, 179 Iowa 912, 916, 162 N.W. 225, 227 (1917) (“[I]n interpreting the Constitution, the court shóuld -consider all matter in pari materia; and all provisions on the same subject matter shall, if possible,' be given effect.”).
' This case involves three questions. First, what branch of government decides where the boundary lies between these two provisions? ■ Second, what substantive standards should the responsible branch of government use in placing the boundary? Third, how should the standards be applied in the case of Griffin? ■
In answering the first question — which branch of government is responsible for deciding where the boundary lies — I begin with analysis of the text of article II, section 5 and the historical context surrounding its development. The “infamous crimes” language of article II, section 5 arose from the Iowa Constitution of 1846. Iowa Const, of 1846, art. Ill, § 5. Prior to 1846, however, a number of state constitutions expressly vested the power to determine what crimes disqualified persons from voting in their legislatures. For example, the Indiana Constitution of 1816 provided, “The general assembly shall have full power to exclude from electing, or being elected, any person convicted of any infamous crime.” Ind. Const, of 1816, art. VI, § 4; see Snyder v. King, 958 N.E.2d 764, 774-75 (Ind.2011). Similarly, the Illinois Constitution of 1818 stated, “The General Assembly shall have full power to exclude from the privilege of electing or being elected any person convicted of bribery, perjury or any other infamous crime.” Ill. Const, of 1818, art. II, § 30. ' The Missouri Constitution of 1820 also provided that “[t]he general assembly shall have power to exclude .. .- from the right of suffrage, all persons con- *212 vieted of bribery, perjury, or. other infamous crime.” Mo.- Const, of 1820, art. Ill, § 14. The Rhode Island Constitution of 18.42 expressly vested in- its legislature power over suffrage, .stating, “Nor- shall any person convicted of bribery, or of any crime deemed infamous at common law, be permitted to exercise that privilege, until he be expressly restored thereto by act of the General Assembly.”, R.I. Const, of 1842, art. II, § 4.
Like the state constitutions of Indiana, Illinois, Missouri, and Rhode Island, the proposed Iowa Constitution of 1844 explicitly vested the general assembly with the power to regulate the franchise. Under the proposed Iowa Constitution, persons were disqualified from voting when them crimes were declared “infamous by act of the legislature.” Iowa Const, of 1844, art. Ill, § 5. In the Iowa Constitution of 1846, however, the legislature no longer had a role in determining disqualification of voters related to infamous crimes. The power of the legislature was deleted, and instead, article III, section 5 simply stated that persons “convicted of any infamous crime” were disqualified. Iowa Const, of 1846, art. Ill, § 5.
Against the historical backdrop, I conclude that the deletion of legislative authority in article III, section 5 should be given its intended effect. . The determination of which crimes might qualify as infamous for purposes of disqualification from suffrage rests with the. court, not with the general assembly. The plurality in Chiodo v. Section 43.24 Panel came to the right conclusion on this issue. 846 N.W.2d 846, 856 (Iowa 2014) (“[I]t appears the drafters at our 1857 constitutional convention intended to deprive the legislature of the power to define infamous crimes.”).
I now turn to the second question: What standard should the court apply to determine which crimes are infamous? This is a difficult question, as the term “infamous crime” is famously ambiguous. As noted by the Supreme Court of Missouri in 1858, the term “infamous” is of “indefinite import.” Birch v. Benton, 26, Mo. 153, 159 (1858). In Chiodo, the plurality correctly noted that “[a]ny definition of the phrase ‘infamous crime’ has vast implications and is not easy to articulate.” 846 N.W.2d at 856. If there is any agreement in this case, it is that the term “infamous crime” is ambiguous.
Yet the overall textual- context may narrow the range of interpretive options for ambiguous terms and phrases. Specifically, the drafters of the Iowa Constitution of 1846 distinguished between the terms “infamous crimes” and “felonies.” . In several places, the Iowa Constitution used the term “felony.” In article III, section 2 the framers used the language' “treason, felony, or breach of peace.” . Iowa, Const.-of 1846, art. Ill, § 2. The same, phrase is used in article IV, section 12, which prevented representatives and senators from being arrested when serving at the General Assembly for all but those crimes. Iowa Const, art. IV, § 12.
But the framers, did not use the term “félony” in article II, section 5 of the Iowa Constitution of 1857. If the 1846 and 1857 framers wished to disenfranchise all felons, they could have said so. We have often said that when a legislative body uses different terms in' an enactment we assume different meanings are intended. Johnson v. Iowa Dist. Ct, 756 N.W.2d 845, 850 (Iowa 2008), .superseded by statute on other grounds, 2009 Iowa Acts ch. 116, § 1; Miller v.. Marshall County, 641 N.W.2d 742, 749 (Iowa 2002). Since the framers rejected the term “felony” as the test for voter disqualification, it would be doubly odd to allow the rejected term to be reinserted as a result of legislative action, particularly when the constitutional draft *213 ers eliminated the role of the legislature in defining infamous crimes.
Further, other state constitutions use the term “felony” to disqualify voters. See, e.g., Del. Const, of 1831, art. IV, § 1 (“[N]o ... person convicted of a crime deemed by law felony, shall enjoy the right to an elector_”); Minn. Const, of 1857, árt. VII, § 2 (“[N]o person who has been convicted of treason, or any felony ,.. shall be entitled or permitted to vote at any election in this State.”). Iowa simply chose different language.
To me, the text and related history make it quite clear that the court must determine the meaning of the term “infamous crimes” and that the term is not synonymous with “felony.” This, of course, is not the end of the matter, but only a good beginning. Having determined that the responsibility is vested with the courts to determine the meaning of infamous crimes and that infamous crimes are not the equivalent' of felonies does not decide the question before us. While all felonies are not infamous crimes, does Griffin’s felony conviction of delivery of cocaine qualify as an infamous crime under article II, section 5?
I now turn to thé functional context, which may help bring an ambiguous term into clearer focus. In some circumstances, the context in which a general term is used will cause us to give it a narrow interpretation. See Des Moines Flying Serv.,Inc. v. Aerial Servs., Inc., 880 N.W.2d 212, 221 (Iowa 2016) (declaring “[cjontext is king” in interpretation of an U.C.G. provision); U.S. Bank Nat’l Ass’n v. Lamb, 874 N.W.2d 112, 119 (Iowa 2016) (interpreting “all liens” to mean-- all judgment liens based on context); Iowa Ins. Inst. v. Core Grp. of Iowa Ass’n for Justice, 867 N.W.2d 58, 72 (Iowa 2015) (giving a harrow interpretation to the broad phrase “all information” based on context). These cases stand for the commonsehse proposition that general phrases with potentially broad application may be given a narrow interpretation when the context of the phrase so requires.
The question is thus not free-standing or abstract. Instead, as noted by Professor LaFave, the meaning of the term “infamous crime” may “depend, to a large extent, on the purpose for which the distinction is to be made.” 1 Wayne R. LaFave, Substantive Criminal Law § 1.6(d), West-law (database updated Oct. 2015) [hereinafter LaFave]; see also 21 Am. Jur. 2d Criminal Law § 23 (2016) (“The meaning of the term ‘infamous crime’ may vary according to the context in which it arises.... ”). The specific question here is the meaning of the term “infamous crime” in the context of the constitutional disqualification of a citizen from the fundamental right to vote as an elector.
I take the lesson of these cases and authorities and apply them here. For instance, in the context of entitlement to presentation before a grand jury under the Fifth Amendment, ■ the term “infamous crime”, turns on the length of punishment. Ex parte Wilson, 114 U.S. 417, 425-26, 5 S.Ct. 935, 939, 29 L.Ed. 89, 92 (1885). , A completely different approach, however, has been taken to the definition of infamous crime in the context of competency of a person to testify. In this context^ an infamous crime is determined not by the length of punishment, but on the nature of the crime. See, e.g., Palmer v. Cedar Rapids & Marion Ry., 113 Iowa 442, 447, 85 N.W. 756, 758 (1901) (“It is well settled that in determining whether the crime ... is an infamous crime, which will disqualify him 'from testifying,'-the nature of the crime, and not the punishment which may be inflicted therefor, is the test.”); 1 Charles F. Partington, The British-Cyclopeadia of Literature, History, Geography,
*214 Law, and Politics 847 (1836) (“A third ground of incompetency is infamy of character. ... It is not sufficient that a party has been convicted and punished for a crime; nor that the punishment itself is deemed by the public degrading and infamous. But the offense must, in its own nature, be infamous.”). Here, the question is whether a crime is considered infamous in the context of disqualification as an elector.
In several of our prior cases, we assumed that Wilson’s treatment of infamous crime in the context of grand jury indictment provided the proper framework for evaluating the meaning of the term in the context of voter disqualification. 114 U.S. at 429, 5 S.Ct. at 941, 29 L.Ed. at 93. For instance, in Blodgett v. Clarke we considered whether a person who had been convicted of forgery was eligible to run for a position on this court, which was then an elected position. 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam), overruled by Chiodo, 846 N.W.2d at 852. Citing Flannagan v. Jepson, 177 Iowa 393, 399-400, 158 N.W. 641, 643 (1916), which in turn cited Wilson, we held that because forgery was subject to imprisonment in the penitentiary, it would be considered an infamous crime. Blodgett, 177 Iowa at 578, 159 N.W. at 244. But the cut-and-paste job transferring the holding of Wilson into the different contexts of voter qualification or qualification to hold office, as the Chiodo plurality pointed out, is not persuasive. 846 N.W.2d at 851.
In considering the meaning of infamous crime in the context of voter disqualification, Professor LaFave concludes that the meaning should track the meaning of the term in the context of competency of witnesses rather than the context of grand jury indictment. 1 LaFave § 1.6(d). According to Professor LaFave,
Where the purpose was in former times to render a witness incompetent (or today to authorize the impeachment of the witness), the term “infamous” properly has reference to those crimes involving fraud or dishonesty or the obstruction of justice (sometimes called crimen falsi). Where the term is used in connection with disbarment or disqualification to hold office, vote or serve on a jury, it generally has a similar meaning.

Id.

Professor LaFave cites Snyder in support of his approach. Id. § 1.6(d) n. 80. In Snyder, the Indiana Supreme Court concluded that the term “infamous crime” was not synonymous with felony for purposes of the infamous crimes clause of the Indiana Constitution. 958 N.E.2d at 771. The Snyder court reasoned that the definition of infamous crime rests upon the context in which it is used. Id. at 777. The Snyder court recognized that in the context of qualification of witnesses, the focus is on the nature of the crime itself and not the punishment. Id. at 778. The Snyder court rejected the proposition that all modern felonies are infamous, noting that under traditional Indiana evidence law, only nine classic common law offenses were considered infamous. Id. at 779. Similarly, infamous crimes under Iowa evidence law traditionally were treason, crimen fal-si, and felonies at common law. Carter v. Cavenaugh, 1 Greene 171,176 (Iowa 1848).
The Snyder court noted that the Webster’s dictionary contemporaneous with the enactment of the Indiana Constitution defined infamous as “most vile; base; detestable.” 958 N.E.2d at 780 (quoting Noah Webster, A Dictionary of the English Language 202 (rev. ed. 1850)). For the Indiana court, the question was what crimes could be considered “most vile; base; detestable” in the context of the purpose of the constitutional provision dis *215 qualifying persons convicted of infamous crimes. Id. The purpose of the constitutional provision, according to the Snyder court, was “to preserve the integrity of elections.” Id. at 782. In order for a crime to be infamous under the regulatory constitutional provision, there had to be a nexus between the crime and the regulatory purposes of the statute. Id. Infamous crimes, for the purpose of voter disqualification, thus were those crimes involving “an affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections.” Id. The Snyder court concluded that there was no such nexus between the crime at issue — battery—and protection of the “integrity of the election process.” Id. at 782-88.
The Snyder court cited the California case Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412 (1966) (en banc),[20] in support of its holding. 958 N.E.2d at 781-82. In Otsuka, the California Supreme Court considered whether conviction of failure to register for selective service amounted to an infamous crime sufficient to disenfranchise the voter under the California Constitution. 51 Cal. Rptr. 284, 414 P.2d at 414. Significantly, the disqualification provision in the California Constitution was nearly identical to article II, section 5 of the Iowa Constitution and in all likelihood was actually based upon the Iowa constitutional provision since the delegates to the 1849 California constitutional convention had the Iowa Constitution as a model. See J. Ross Browne, Report of the Debates in the Convention of California 24 (1850) (reporting that every member of the convention was provided a copy of the Constitution of Iowa to “take into consideration ... as a basis for the Constitution of California”).
The Otsuka court distinguished between infamous crimes for purposes of determining when charges must be brought before the grand jury and infamous crimes for purposes of determining the competency of a person to testify. 51 CaLRptr.' 284, 414 P.2d at 421. The Otsuka court held that the purpose of disqualification was to prevent “morally corrupt and dishonest voters [who] ... may reasonably be deemed to constitute a threat to the integrity of the elective process.” Id., 51 CaLRptr. 284, 414 P.2d at 422 (emphasis added). Finding no threat to the elective process, the Otsuka court determined that conviction for selective service crimes should not be considered infamous under the constitutional provision. Id., 51 CaLRptr. 284, 414 P.2d at 425.
Turning to the proper approach to the Iowa Constitution, I begin with the proposition that the disqualification provision of article II, section 5 should be narrowly construed for two reasons. First, the right to vote is fundamental to the democratic process, and as noted by the Chiodo plurality, abridging the right to vote “must be carefully and meticulously scrutinized.” 846 N.W.2d at 856 (quoting Devine v. Wonderlich, 268 N.W.2d 620, 623 (Iowa *216 1978)). ■ Second, article II, section 5 is a forfeiture provision. The law has traditionally construed forfeiture provisions in a narrow fashion. See, e.g., In re Wagner, 482 N.W.2d 160, 162 (Iowa 1992); In re Kaster, 454 N.W.2d 876, 877 (Iowa 1990); 3A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 68:5, at 340 (7th ed.2010).
Based on the above considerations,. I conclude that the approach in Snyder is the correct one. 958 N.E.2d at 779, 782-83. Infamous crimes, for purposes of article II, section 5, are those that undermine the integrity of the election process. As suggested by LaFave, these infamous crimes are .crimen falsi — crimes where the honesty and integrity of the convicted person is drawn in question, or crimes that interfere with the electoral process. See 1 LaFave § 1.6(d).
I now turn to the final question: the application of the standard to this case. I think it is clear that Griffin’s drug crimes do not qualify as crimen falsi or crimes that interfere with the electoral process. No one would seriously argue that Griffin' — who was placed on probation after her conviction and now has fully discharged her sentence — poses any threat to the integrity of the electoral process or that allowing her to vote threatens the administration of justice. Further, her crime was certainly not treason or common law felony. Carter, 1 Greene at 177. I would thus find that Griffin was not convicted of an infamous crime and that she is. entitled to exercise the fundamental right to vote of every citizen under article II, section 1 of the Iowa.Constitution.
I close with some observations on the implications of this case pointed out by amici who filed helpful briefs in this case. As pointed out by the’ briefs of the NAAGP Legal Defense and Educational Fund and the League' of Women Voters, the history of voter disqualification has disturbing .features; In southern states after reconstruction, voter disqualification on the grounds of being convicted of infamous crimes was used as a tool to prevent African Americans from voting. Indeed, the Mississippi Supreme Court candidly explained that the purpose of its constitutional provision prohibiting persons from voting based on conviction of various offenses was to “obstruct the exercise of the franchise by the, negro race.” Ratliff v. Beale, 74 Miss. 247, 20 So. 865, 868 (1896). In 1985, the Supreme Court held that Alabama’s constitutional provision disenfranchising persons convicted of a crime of moral turpitude violated equal protection under the United States Constitution. Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 1922, 85 L.Ed.2d 222, 231 (1985). The Hunter Court concluded that the crimes selected for inclusion as crimes of moral turpitude “were believed by the delegates to be more frequently committed by blacks.” Id. at 227, 105 S.Ct. at 1919, 85 L.Ed.2d at 227.
While there is no allegation of intentional discrimination' in this case, the amici point out that felony disenfranchisement has grossly disproportionate effects on African American males. Researchers at the Sentencing Project estimate that approximately- twenty-five percent of African American males, in- Iowa are disenfranchised by the legislature’s implementation of article II, section 5. R.A. Lenhardt, Understanding the Mark: Race, Stigma, and-. Equality, in Context, 79 N.Y.U. L. Rev. 803, 918-19 (2004) (citing The Sentencing Project & Human Rights Watch, Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States 8 (1998)). The exclusion of ex-felons in Iowa has produced a disenfranchisement rate for African Americans in Iowa that is “more than triple” the national rate. The Sentencing Project, Iowa and Felony *217 Disenfranchisement 2 (2005), https://web. archive.org/web/20131019085622/http:// www.sentencingproject.org/doc/pub lications/fd_iowa.pdf.
The amici further point out that disproportionate voter disenfranchisement does not simply impact the individual, but penalizes the communities from which wrongdoers come and reduces their political clout. As noted by the League of Women Voters, “[o]ne of the most prominent and consistent finding[s] in [the] literature is that [felony disenfranchisement] laws produce a disproportionate effect on black communities.” See Melanie Bowers & Robert R. Preuhs, Collateral Consequences of a Collateral Penalty: The Negative Effect of Felon Disenfranchisement Laws on the Political Participation of Nonfelons, 90 Soc. Sci. Q. 722, 723 (2009).
Another amicus points out that veterans of America’s recent wars suffer from post-traumatic stress syndrome that can lead to felony convictions, which, in context, should not be considered so infamous as to lead to lifetime voter disqualification and the resulting stigma. Today’s decision, of course, provides little comfort to them.
Further, it is not clear exactly what policies are actually advanced by voter disenfranchisement. As noted in Dillenburg v. Kramer, “[c]ourts have been hard pressed to define the state interest served by laws disenfranchising persons convicted of crimes.” 469 F.2d 1222, 1224 (9th Cir. 1972). Given the lack of a compelling state interest and the fundamental individual interests involved, the American Bar Association recommended in 1981 that “[p]ersons convicted of any offense should not be deprived of the right to vote either by law or by the action or inaction of government officials,” Andrew L. Shapiro, Challenging Criminal Disenfranchisement,■ Under the Voting Rights Act: A New Strategy, 103 Yale L.J. 537, 560 (1993) (quoting ABA Standards for Criminal Justice: Legal Status of Prisoners 23 — 8.4, at 145 (2d ed.1981)). Further, the American Law Institute’s Model Penal Code states that “a person who is convicted of a crime shall be disqualified ... from 'voting in a primary or election if and only so long as he is committed under a sentence of imprisonment.” Model Penal Code § 306.3(1), 10A U.L.A. 751 (2001).
The majority opinion leaves a couple avenues of redress for those seeking to vote after fulfilling their criminal sanctions. Relief through the exercise of the gubernatorial-power is a possibility, but there is no constitutional requirement that the governor establish an administrative process for restoring voting rights. Further, all administrative processes involve burdens of some kind, some slight, others more substantial. Another avenue of change, of course, is a constitutional amendment.
But for now, the majority opinion endorses a very broad interpretation of the disqualification provision of article II, section 5 of the Iowa Constitution that will disqualify thousands of Iowans from exercising the fundamental right to vote after they have fully satisfied their criminal sentences, even without a showing of nexus of the crime to the integrity of the electoral process. The likelihood is that those convicted of felonies who have fully served their sentences will have their rights subject to flip-flopping executive orders depending upon the political philosophy of the executive rather than upon a more stable legal regime. Sadly, that is exactly what ensnared Griffin into the law’s web after she completed her criminal sentence.
WIGGINS and HECHT, JJ., join this dissent.

. In addition to her challenge to section 39.3(8) as applied, Griffin contends several other statutes regulating election processes— including Iowa Code sections 43.18(9), 48A.6(1), 48A.14(l)(e), 48A.30(l)(d), 49.79(2)(0 and 57.1(2)(c) — as well as the current voter registration forms and related regulations, the Governor's Executive Order 70, and related procedures all serve to disqualify persons convicted of noninfamous felony offenses as electors and are therefore unconstitutional As applied.

. Griffin also has a 2001 conviction for possession of ethyl ether in violation of Iowa Code section 124.401(4)(c) (2001), a Class “D” felony. That conviction is not relevant in this case because Griffin discharged the sentence in 2006, when Executive Order 42 was in force, and Executive Order 70 does “not affect the restoration of rights ... granted prior to” its 2011 effective date.

. The California Supreme Court overruled Otsuka in Ramirez v. Brown, 9 Cal.3d 199, 107 Cal.Rptr. 137, 507 P.2d 1345, 1353 (1973). In Ramirez, however, the California Supreme Court overruled Otsuka not because it went too far in protecting the right to vote, but because it did not go far enough. Id. The Ramirez court ruled that the California constitutional provision violated federal equal protection because it imposed undue burdens on the right tp vote. Id. Ramirez was then overturned on appeal by the United States Supreme Court. Richardson v. Ramirez, 418 U.S. 24, 56, 94 S.Ct. 2655, 2671, 41 L.Ed.2d 551, 572 (1974). Because of Otsuka’s unique procedural history, the Snyder court's reliance on its reasoning remains apt.